# EXHIBIT A

**SUM-100**

# SUMMONS
## *(CITACION JUDICIAL)*

| | FOR COURT USE ONLY<br>*(SOLO PARA USO DE LA CORTE)* |
|---|---|

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*

BMW FINANCIAL SERVICES NA, LLC, a Delaware Limited Liability Company; PAG
SANTA ANA B1, INC., a Delaware Corporation; and DOES 1 through 30, inclusive

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*

HAGOB BOYADJIAN, an individual

---

**NOTICE!** You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. **NOTE:** The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.
*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

---

| The name and address of the court is:<br>*(El nombre y dirección de la corte es):* Orange Country Superior Court<br>*sb*<br>~~Central Justice Center~~<br>~~700 Civic Center Drive West, Santa Ana, CA 92701~~ North Justice Center<br>1275 North Berkeley Avenue<br>Fullerton, CA 92832 | CASE NUMBER:<br>*(Número del Caso):*<br>30-2023-01365243-CU-CO-NJC |
|---|---|
| | Judge Donald F. Gaffney |

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*

Hovanes Margarian, SBN 246359; Armen Margarian, SBN 313775; Shushanik Margarian, SBN 318617; 462 West Colorado Street, Glendale, CA 91204; (818) 553-1000

| DATE:<br>*(Fecha)* 11/29/2023 | DAVID H. YAMASAKI, Clerk of the Court | Clerk, by<br>*(Secretario)* S. Berry | , Deputy<br>*(Adjunto)*<br>S. Berry |
|---|---|---|---|

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario Proof of Service of Summons, (POS-010)).*

**NOTICE TO THE PERSON SERVED:** You are served

[SEAL]

1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*

3. ☐ on behalf of *(specify):*

   under: ☐ CCP 416.10 (corporation)      ☐ CCP 416.60 (minor)
   ☐ CCP 416.20 (defunct corporation)      ☐ CCP 416.70 (conservatee)
   ☐ CCP 416.40 (association or partnership)      ☐ CCP 416.90 (authorized person)
   ☐ other *(specify):*
4. ☐ by personal delivery on *(date):*

**Page 1 of 1**

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. July 1, 2009]      **SUMMONS**      Code of Civil Procedure §§ 412.20, 465
www.courtinfo.ca.gov

Hovanes Margarian SBN 246359
hovanesm@margarianlaw.com
Armen Margarian, SBN 313775
armenm@margarianlaw.com
Shushanik Margarian, SBN 318617
shushanik@margarianlaw.com
THE MARGARIAN LAW FIRM
462 West Colorado Street
Glendale, California 91204
Telephone Number: (818) 553-1000
Facsimile Number: (818) 553-1005

Attorneys for Plaintiff
HAGOB BOYADJIAN

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## THE COUNTY OF ORANGE

| | |
|---|---|
| HAGOB BOYADJIAN, an individual,<br><br>     Plaintiff,<br><br>vs.<br><br>BMW FINANCIAL SERVICES NA, LLC, a Delaware Limited Liability Company; PAG SANTA ANA B1, INC., a Delaware Corporation; and DOES 1 through 30, inclusive,<br><br>     Defendants. | Case No.: 30-2023-01365243-CU-CO-NJC<br><br>**PLAINTIFF'S COMPLAINT FOR DAMAGES**<br><br>**Assigned for All Purposes**<br>Judge Donald F. Gaffney |

///
///
///
///
///
///
///
///
///
///

## NATURE OF THE ACTION

NOW COMES Plaintiff HAGOB BOYADJIAN, an individual ("Plaintiff"), by and through his attorneys of record, The Margarian Law Firm, with Plaintiff's Complaint for Damages against Defendants BMW FINANCIAL SERVICES NA, LLC, a Delaware Limited Liability Company; PAG SANTA ANA B1, INC., a Delaware Corporation; and DOES 1 through 30, inclusive ("Defendants").

Plaintiff is informed and believes, and based thereon alleges, that during the lease of the new 2020 BMW X5 sDrive40i bearing the Vehicle Identification Number 5UXCR4C06L9B32154 ("Subject Vehicle") Defendants defrauded Plaintiff by inducing him to enter into the Motor Vehicle Lease Agreement (Closed End) – California ("Lease"), (the true and correct copy of the Lease is attached hereto and marked as "Exhibit A") allegedly including the term regarding the event of a total loss that entitles Defendants to collect sums which do not belong to them. Defendants, verbally and in writing in the Lease, assured Plaintiff that the financial obligation under the Lease would be at the set sums not to exceed the down payment, monthly payments, and the lease end fee. This gave Plaintiff a fixed exposure and the flexibility to purchase the Subject Vehicle at any point in time for the remaining balance on the lease account. This also gave Plaintiff the assurance that he would keep any value above that balance as equity. The Subject Vehicle was deemed a total loss. Following the determination of the total loss, the insurance company issued payments to Defendants. Defendants committed fraud and therefore violated several statutes under California state law immediately upon Defendants receiving the insurance payments and failing to remit Plaintiff's equity. As a direct consequence, Plaintiff incurred damages due to Defendants' fraudulent conduct.

## PARTIES

1.    Plaintiff is and was at all times relevant herein an individual residing in Los Angeles County, State of California and leased the Subject Vehicle in the State of California.

2.    Defendant BMW FINANCIAL SERVICES NA, LLC ("BMW Financial Services") is and was at all times relevant herein a Delaware Limited Liability Company, located and doing business at 300 Chestnut Ridge Road, Woodcliff Lake, New Jersey 07677. BMW Financial Services was at all times relevant herein a financial service provider authorized to do business as in the State of California and was engaged in the financing and leasing of motor vehicles pursuant to the laws of California.

3. Defendant PAG SANTA ANA B1, INC., a Delaware Corporation, is and was at all times relevant herein located and doing business as CREVIER BMW at 1500 S. Auto Mall Drive, Santa Ana, CA 92705 ("Dealership"). Dealership was at all times relevant herein a dealership authorized to do business in the State of California and is engaged in the sale, and distribution of motor vehicles pursuant to the laws of the state of California.

4. BMW Financial Services, Dealership, and DOES 1 through 30, inclusive, are collectively hereby referred to as "Defendants".

5. The true names and capacities, whether individual, corporate, associate or otherwise of defendants DOES 1 through 30, inclusive, are unknown to Plaintiff, who therefore sues said defendants by such fictitious names. Plaintiff is informed and believes and based thereon alleges that each of the defendants designated herein as a DOE is legally responsible in some manner for the events and happenings herein referred to, and legally caused injury and damages proximately thereby to Plaintiff as herein alleged.

6. Plaintiff is informed and believes and based thereon alleges that at all times herein mentioned, Defendants, and each of them, were the agents, servants, employees, and/or joint venturers of their co-defendants and, as such, were acting within the course, scope, and authority of said agency, employment, and/or venture. Plaintiff further alleges that each act alleged herein, whether by named defendant or fictitiously named defendants, were expressly authorized or ratified, as the terms are used in Cal. Civ. Code § 3294(b), by each and every other defendant herein, whether named or fictitiously named.

7. Plaintiff is informed and believes and based thereon alleges that at all times relevant herein, defendants, and each of them, were the agents, servants, employees, partners, and/or joint venturers of their co-defendant and were, as such, acting within the course, scope, and authority of said agency, employment, partnership, and/or venture. On information and belief, Plaintiff alleges that the act of any defendant, including those fictitiously named, is imputable to each and every other defendant because one or more of the following relationships existed among Defendants: principal-agent, employer-employee, partner, parent company, sub-company, or such other relationship which would make any liability vicarious and imputable to such defendant in this type of relationship. Plaintiff further contends that each act alleged herein, whether by named defendant or fictitiously named defendants, was expressly

authorized or ratified, as these terms are used in § 3294(b), by each and every other defendant herein, whether named or fictitiously named.

8.     To the extent that any defendant was an independent contractor, Plaintiff alleges that the other defendants exercised such dominion and control over the manner, method, and means of the work contracted for that the negligence of any independent contractor should in law, be attributed to the principal who hired such contractor. *See, Washington v. Franciscan Health Sys.*, No. C17-5690 BHS, at *13 (W.D. Wash. July 24, 2018) ["[T]he parties are separately liable for the negligence or misconduct of their agents or employees."] *Otis Elevator Company v. First National Bank of San Francisco*, 163 Cal. 31, 39 (Cal. 1912) ["It is the general doctrine of the law, as it is our statutory rule, that a principal is liable to third parties not only for the negligence of its agent in the transaction of the business of the agency, but likewise for the frauds, torts or other wrongful acts committed by such agent in and as part of the transaction of such business."]

9.     Plaintiff is informed and believes and based thereon alleges that, at all times relevant herein, the agents, servants, employees, partners, and/or joint venturers of Defendants were acting within the course and scope of said employment and with the consent of, and under the close direction and control of the officers, directors, partners, or managing agents of Defendants, and that said officers, directors, partners, or managing agents personally authorized, approved of, adopted, and/or ratified the acts alleged herein.

10.     Plaintiff is informed and believes and based thereon alleges that, at all times relevant herein, the officers, directors, partners, or managing agents of Defendants, whose names are not currently all known to Plaintiff, personally participated in the acts alleged herein.

11.     Plaintiff is informed and believes and based thereon alleges that, at all times relevant herein, the officers, directors, partners, or managing agents of Defendants personally acted with oppression, fraud, or malice in their dealings with Plaintiff regarding the subject alleged in this Complaint.

12.     Plaintiff is informed and believes and based thereon alleges that, at all times herein relevant, the officers, directors, partners, or managing agents of Defendants personally had close supervision of their agents, servants, employees, partners, and/or joint venturers and were familiar with the facts regarding the occurrence with Plaintiff alleged herein.

13.     Plaintiff is informed and believes and based thereon alleges that after learning of the acts of the agents, servants, employees, partners, and/or joint venturers of Defendants, the officers, directors, partners, or managing agents of Defendants personally failed and refused to repudiate said actions and failed to redress the harm done to Plaintiff, and failed and refused to punish or discharge the said agents, servants, employees, partners, and/or joint venturers of Defendants.

### STATEMENT OF RELEVANT FACTS

14.   On or about 04/21/2020, Plaintiff visited Dealership with the intent to acquire a vehicle for personal use.

15.   Dealership's personnel, including, but not limited to, Salesperson (name unknown this time) and Finance Manager (name unknown this time) presented the Subject Vehicle to Plaintiff.

16.   Plaintiff inquired regarding the purchase and lease options informing Salesperson and Finance Manager that he wanted to lease a vehicle to keep the monthly payments low, but also preferred the option to eventually own the vehicle.

17.   Salesperson and Finance Manager informed Plaintiff about an option to lease the Subject Vehicle at a low cost, with a possibility to purchase it later. By making lease payments, Plaintiff would reduce the principal balance on the Subject Vehicle and eventually buy it for a reduced price based on the number of payments made.

18.   Salesperson and Finance Manager assured that Plaintiff would thus build equity in the Subject Vehicle that would belong to her.

19.   Based on this information, Plaintiff decided to lease the Subject Vehicle and requested to proceed with the lease.

20.   The agreed upon value of the Subject Vehicle was $62,320.00. Finance Manager explained and showed to Plaintiff on the Lease how the price was used to compute the lease payments and how the lease payments would reduce the principal balance over time. The balance would go down to the residual value at the end of the lease. It was further explained that Plaintiff would be able to purchase the Subject Vehicle before the lease ended or at the lease end for the residual value.

21.   Plaintiff asked if he could walk away from the Lease if the Subject Vehicle was worth less than the residual balance or buy it if it was worth more. Finance Manager confirmed this, stating that

Plaintiff could benefit from any equity accrued during the lease term. This convinced Plaintiff to choose the lease over a purchase and signed the Lease.

22.    The terms of the Lease were devised and drafted by BMW Financial Services, by and through its executives and agents some time prior to 04/21/2020. They were presented to Plaintiff by Dealership's personnel who, along with other authorized dealerships, distributed this adhesive contract.

23.    Plaintiff reasonably relied on the misrepresentations made by the personnel at Dealership. As a result of the misrepresentations, Plaintiff leased the Subject Vehicle instead of purchasing it. Had Plaintiff known that the statements about the equity rights were false, he would have never agreed to lease the Subject Vehicle. Plaintiff would have negotiated other terms and purchased the Subject Vehicle instead of leasing it.

24.    As a result of the misrepresentations made to Plaintiff, he has now lost the sum of $16,829.57. If he knew the statements were false sooner, he would have refinanced the Subject Vehicle as a purchase.

25.    On 02/01/2022, the Subject Vehicle was involved in an incident and deemed a total loss. Plaintiff filed a claim with his insurance company, Farmers Insurance Exchange ("Farmers Insurance").

26.    On or about 02/15/2022, Farmers Insurance determined that the actual cash value for the Subject Vehicle was $59,506.00, plus sales tax of $6,099.37, license/transfer fees of $136.33, and other fees of $225.00. Upon subtracting the $1,500.00 deductible, the total insurance payout was $64,466.70. (The true and correct copy of the respective letter is attached hereto and marked as "Exhibit B".)

27.    Subsequently, BMW Financial Services collected the full sum of $64,466.70 and refused to remit any amounts to Plaintiff.

28.    As such, on or around the day Farmers Insurance processed the insurance payments, BMW Financial Services was in receipt of the insurance payments, and failed to remit Plaintiff's equity, BMW Financial Services committed fraud and violated several statutes, including but not limited to, California Consumer Legal Remedies Act, Business and Professions Code, and breached the Implied Covenant of Good Faith and Fair Dealing.

29.    Consequently, Plaintiff incurred damages at the point of time as specified in paragraph 28 above.

30.    BMW Financial Services committed fraudulent conduct by withholding Plaintiff's equity in

1  the amount of $16,829.57.

2      31.   The Adjusted Lease Balance at the time of the loss was $47,287.13 and therefore the equity

3  amount of $16,829.57 (Disposition Fee plus the Adjusted Lease Balance minus the Realized Value of the

4  Subject Vehicle) which BMW Financial Services collected, belonged to Plaintiff.

5      32.   Plaintiff believes that BMW Financial Services acted under the theory that it was entitled to

6  the full sum of the insurance proceeds based on its interpretation of the Lease that it is a "loss payee"

7  pursuant to section 20 of the Lease.

8      33.   However, section 20 of the Lease states that BMW Financial Services will be named "as an

9  additional insured and loss payee." Thus, the coverage would name both Plaintiff and BMW Financial

10  Services as insured and loss payee at the time of the total loss.

11      34.   Whereas BMW Financial Services unilaterally decided to ignore the above stated material

12  distinction and declared itself as a sole loss payee at the time of collecting the full sum of the insurance

13  proceeds, including the equity amount of $16,829.57.

14      35.   Furthermore, the following analysis of the pertinent sections of the Lease clearly shows

15  otherwise.

16      36.   Plaintiff further believes that BMW Financial Services interpreted the Lease terms as that the

17  Lease termination under section 24 also implied that the Purchase Option was no longer in effect and

18  hence BMW Financial Services was the owner of the leased Subject Vehicle. Section 24 of the Lease

19  does not contain any language related to the option to purchase the Subject Vehicle after a total loss

20  claim.

21      37.   Upon a review of the entire Lease, it is clear that Section 27, entitled "Purchase Option,"

22  governs the aforementioned topic. Pursuant to the Lease, Plaintiff has an unequivocal right to purchase

23  the Subject Vehicle "AS-IS, WHERE-IS," i.e. at the time of the total loss claim. This right is stated within

24  the Lease. There is no language indicating that this option terminates if the Subject Vehicle is declared a

25  total loss. Therefore, even if BMW Financial Services was affirmed that the option to purchase does not

26  exist after a total loss claim such an affirmation is unsupported and false. *See* Exhibit A, at section 27, p.

27  5 of 7**.**

28      38.   Therefore, at the time of the total loss, Plaintiff had the right to acquire the Subject Vehicle for

the Adjusted Lease Balance ($47,287.13). He could do so concurrently with his insurance company remitting the total loss payment of $64,466.70, leaving Plaintiff with the equity gain. BMW Financial Services refused and deprived Plaintiff of his unequivocal right to do so. The statement that Plaintiff would have been obligated to "re-register and re-title the Vehicle at [his] own expense in [his] own name" relieved BMW Financial Services of that liability but did not restrict Plaintiff from his legal options to sell the Subject Vehicle concurrently and avoid paying those sums. Furthermore, the Lease states that Defendants' sole remedy in the event Plaintiff failed to re-register the Subject Vehicle (which would be the case if he sold it) would be to cancel the registration. That would be inconsequential. BMW Financial Services refused to allow Plaintiff to do so. Instead, BMW Financial Services collected and withheld the excess sums recovered from the insurance company.

39.   Further, according to section 30 of the Lease (*See* Exhibit A, at section 30, p. 5 of 7.**)** Plaintiff has the right to terminate the Lease early by purchasing the Subject Vehicle provided that he has complied with all of the terms of the Lease and met all of the early termination obligations. If Plaintiff does not choose to purchase the vehicle, he may pay the sum of: (1) $0 since he had no past due monthly payments; plus (2) $0 due to lack of any official fees and taxes assessed or billed in connection with this Lease and the Vehicle and any other amounts needed to satisfy [Plaintiff's] obligations under this Lease; plus (3) a $350 Disposition Fee; plus (4) the amount by which the Adjusted Lease Balance exceeds the Realized Value of the Vehicle.

40.   The Adjusted Lease Balance at the time of the total loss was $47,287.13 computed pursuant to the constant yield method as displayed in the attachment below marked as "Exhibit C".

41.   The Realized Value of the Subject Vehicle was in fact to be the amount of the insurance proceeds pursuant to section 31 of the Lease which states that if the Subject Vehicle is declared a total loss and Plaintiff has met his insurance obligations, the Realized Value is the amount received from the insurance claim settlement, minus any deductible.

42.   Accordingly, the Realized Value for the Subject Vehicle was $64,466.70. Therefore, Plaintiff needed to pay BMW Financial Services a sum equal to $350 plus $47,287.13 minus $64,466.70, totaling -$16,829.57.

43.   The above assessment is based on Plaintiff's right to terminate the Lease as outlined in Section

30 of the Lease, which specifically addresses the possibility of termination in the event of a total loss.

44.   The language in the respective paragraph of the Lease clearly indicates that it pertains to a scenario where the value of the Subject Vehicle is lower than the outstanding Adjusted Lease Balance. Please refer to Exhibit A, sections 24 and 25, page 4 of 7. It states that Plaintiff would be responsible for paying the difference. If the language had intended to address a positive sum or credit after paying off the Adjusted Lease Balance, it would have explicitly mentioned it.

45.   In Section 25 of the Lease, it is indicated that the Lease includes gap coverage, which is a standard provision in consumer vehicle leases, provided that the total loss claim is paid by an insurance carrier. It simply states that Plaintiff is not obligated to pay the gap amount. This implies that the gap is expected to be a positive number, meaning that the Adjusted Lease Balance would be higher than the actual cash value of the Subject Vehicle. It does not address what would happen if the gap amount is negative, indicating that there is equity in the Subject Vehicle.

46.   In general, the Lease does not discuss or contemplate a scenario where there is a positive credit after paying off the Adjusted Lease Balance.

47.   Furthermore, pursuant to Section 23 of the Lease, if Plaintiff had been in default and/or uninsured, BMW Financial Services would have been able to recover a sum of -$16,829.57 as that is the amount by which the Adjusted Lease Balance exceeds the Realized Value.

48.   The Lease does not have any language wherein it states that if the consumer's obligation derived by subtracting the Realized Value from the Adjusted Lease Balance is a negative sum, then BMW Financial Services shall take that amount. This lack of specific reference to this scenario leaves us but one option – to proceed with basic equitable principles. *See PLCM Group, Inc. v. Drexler*, 22 Cal.4th 1084, 1090 (Cal. 2000) ["equitable considerations must prevail over both the bargaining power of the parties and the technical rules of contractual construction."] citing *International Industries, Inc. v. Olen*, 21 Cal.3d 218 (Cal. 1978)

49.   If the consumer owes the finance company a negative sum, then the consumer has a credit in that amount and the consumer should be paid out that sum upon closing of his/her account. Any financial institution has a fiduciary duty to follow basic equitable principles and basic math. *Martin v. Hotel & Transp. Consultants, Inc.*, Civ. No. 17-00088 JMS-KSC, at *14 (D. Haw. June 1, 2018) describes

fiduciary duties as "comprised of utmost good faith, integrity, honesty, and loyalty, as well as a duty of due care and diligence)." citing *Rose v. Showalter,* 108 Idaho 631 (Idaho Ct. App. 1985)

50.   BMW Financial Services has wrongfully withheld the sum of $16,829.57 from Plaintiff assuming that since the difference between the Adjusted Lease Balance and the Realized Value is not a positive number, there are no more financial obligations between Plaintiff and Defendants. But this interpretation reeks of ignorance and lacks common sense. This is also unconscionable and outrageous.

51.   Consumer complaints below show that BMW Financial Services continues to act this way. Therefore, the encounter with Plaintiff did not stop and continues to happen to other consumers.

- "My contract with BMW FS showed I owed $28,069.50, however, BMW told my insurance I owed $40,740.44. Insurance sent them a check for $40,740.44. I originally leased to own the car 3 years ago for 39k ... BMW FS also is taking registration fees and taxes that they NEVER paid. Today I called asking for my 12k and they said there's a clause in my lease agreement called section 25.  I had an attorney review the agreement and Section 25 is regarding the terms on when the car is worthless and then the program's benefit for waiving up to $50,000 will be in effect. When calling BMW FS they told me they have "no comment" and to mail their legal team. Their legal team is unable to answer any questions. Totaled my car owned 28k on the car and my insurance company gave BMW a financial 41k. BMW is keeping the additional 12k. During this process, I called Pacific BMW and BMW Financial asking the steps to take and the process. I asked if it's best I pay out the 28k now I owe or have insurance send the 41k check to them. They told me to have insurance send BMW the check and they will send the extra amount back to me." (January 2022, https://www.yelp.ca/biz/bmw-financial-services-hilliard-2?start=10&sort_by=rating_asc))

- "I leased a 2021 530 from BMW finance with $4047 downpayment. The car was hit from behind and was totaled on 2/11/2022. the total payoff amount at the time was about $45000. My Geico insurance paid BMW $58000. They refused to refund me the difference. Because I set up autopay, they took my monthly payment twice since the car was totaled on 2/11/22.  one payment was posted on 2/21/2022 and last payment was on

3/21/2022. My insurance sent the payoff payment on 3/14 and they did not post it on my account until they took another monthly payment on 3/21/2022. They never refund my two month's overpayment. Now I lost all my downpayment plus additional two monthly payment after the car was totaled. I have to pay much high price for a new car. Will never lease a car from them again!" (March 2022, https://www.google.com/maps/contrib/104080104074433180962/place/ChIJUwAaZdLl wokRt6IXmxWKiCo/@41.8412596,-73.2104389,8z/data=!4m6!1m5!8m4!1e1!2s104080104074433180962!3m1!1e1?hl=en-US)

- "Read this before leasing! I leased a 2021 BMW in April 2021 and the car was totaled, we were hit from behind. BMW Financial not only took an extra payment from us after the total loss (it was set on auto pay) and refused to pay it back, they also pocketed the excise tax and kept the equity in the car since cars are more valuable now than before. My payoff amount on the lease was roughly 5k less than the equity from the insurance payoff. Not only did they keep the equity, they didn't help me get into a new lease that was roughly $200 more expensive per month now for the same car. Contacting them is a complete nightmare, they only offer one number and they are short staffed so after hours of waiting and getting passed around between multiple employees there are still no answers. DO NOT LEASE through this company they will rip you off the first chance they get and they make it nearly impossible to get in contact. The only partial refund they gave me was my initial down payment depreciated, even though the car appreciated in value. I expected so much better from a company of this size and prestige. This is a very sleazy way of doing business and I hope it catches up to them." (April 2022, https://www.google.com/maps/contrib/114889933190991383704/place/ChIJUwAaZdLl wokRt6IXmxWKiCo/@41.8487381,-72.491936,8z/data=!4m6!1m5!8m4!1e1!2s114889933190991383704!3m1!1e1?hl=en-US)

- "First Time BMW Owner...1 And Done" Company is a joke...My son had a near fatal

accident and the 3 month old BMW was totaled. the payoff on my lease was right under $43000, My insurance company paid out over $57000, taking into consideration that car prices are at a premium and the average cost of the same model. The check was sent to BMW and they have told me that they are keeping the full amount...Not even returning my down payment. IS THIS NORMAL? BMW just padded their books with $15000+ in profits for 2021, hope it was worth losing a family of 5 car owners! I'm Very Upset with BMW, and more so I would be embarrassed if I was BMW. Goodbye BMW,  I'm going back           to           Mercedes!"           (April           2022, https://www.google.com/maps/contrib/105613037378056871297/place/ChIJUwAaZdLl wokRt6IXmxWKiCo/@40.6038023,-74.4348489,9z/data=!4m4!1m3!8m2!1e1!2s105613037378056871297?hl=en-US)

- "Be very careful when doing business with this company, they literally screw their clients over and step all over them. We leased a 2022 BMW 3 series in February 2022. We gave a $6000 down payment as my daughter was a first time buyer and the dealer said it was required for her to get approved. 4 months later the vehicle was totaled in an accident. Allstate insurance was horrible and took 30 days to determine the car totaled. BMW financial terminated the lease however they still build us for two additional payments afterward for a total of 6 payments. The purchase price of the vehicle was about $45,000. We gave a $6000 down payment and made a total of 6 payments. At the time the vehicle was totaled we owed just over $38,000 if we were to purchase it, this was the plan. BMW demanded $50,000 from Allstate insurance and still charge me the deductible. If you do the math, BMW made over $62,000 on this $45,000 vehicle essentially spitting at their clients and profiting from their loss. It is beyond me how this is allowed however I will be filing report with the Attorney General's office and any other available avenues." (September           2022,           https://www.yelp.ca/biz/bmw-financial-services-hilliard-2?sort_by=rating_asc)

- "Be very careful when doing business with this company, they literally screw their clients over and step all over them. We leased a 2022 BMW 3 series in February 2022. We gave

a $6000 down payment as my daughter was a first time buyer and the dealer said it was required for her to get approved. 4 months later the vehicle was totaled in an accident. Allstate insurance was horrible and took 30 days to determine the car totaled. BMW financial terminated the lease however they still build us for two additional payments afterward for a total of 6 payments.The purchase price of the vehicle was about $45,000. We gave a $6000 down payment and made a total of 6 payments. At the time the vehicle was totaled we owed just over $38,000 if we were to purchase it, this was the plan. BMW demanded $50,000 from Allstate insurance and still charge me the deductible. If you do the math, BMW made over $62,000 on this $45,000 vehicle essentially spitting at their clients and profiting from their loss. It is beyond me how this is allowed however I will be filing report with the Attorney General's office and any other available avenues. Terrible    terrible    practices."    (09/30/2022,    https://www.yelp.ca/biz/bmw-financial-services-hilliard-2?hrid=YVx0ISJzAFtHaK2-JUP6vA&utm_campaign=www_review_share_popup&utm_medium=copy_link&utm_source=(direct))

- "This company has given me the most crass and unethical treatment I've ever received.  I wish I was exaggerating… I put down $10,000 on a lease and 1.5 months later due to an accident I wasn't at fault for, the vehicle was totaled… regardless of the situation, at least there was a silver lining… I could recoup most of my down payment and purchase a new vehicle… instead, BMW financial informed me they would be keeping all benefits awarded to me by my insurance… that's right, instead of getting the additional $10,000 in value to payoff, they stole the 10k and left me with nothing…. On top of this, they came after me for an additional 3 payments AFTER THE VEHICLE WAS TOTALED. Great look BMW! Stealing from your consumer to take profit.  Don't make the same mistake I did… NEVER FINANCE WITH THIS TRASH COMPANY, and don't lease a BMW EVER!"                                    (February                                    2023, https://www.google.com/maps/contrib/100200288640648638536/place/ChIJUwAaZdLl wokRt6IXmxWKiCo/@41.0349328,-

74.0752131,16z/data=!4m6!1m5!8m4!1e1!2s100200288640648638536!3m1!1e1?hl=en-US)

- "On June 9th 2023, I was rear ended which resulted in a total loss of my leased BMW vehicle. The car was around $61,000 where I put $14,000 down along with a years worth of payments. At the time of the accident, the pay off amount for the leased vehicle was $44,000. After the assessment was performed by my insurance company, it was determined the amount the car was worth was $56,000. BMW Financial has stated since this was a total loss, the lease is terminated and they will be keeping the entire amount rather than paying the lease pay off then providing me the different which is around $12,000. From my insurance company, to dealerships with me looking for a new car, to my lawyer, all stated they have never heard of this before and the logical outcome should be me being provided the balance after the lease payoff of $44,000 was taken out. My insurance agent as well as myself spoke with 2 representatives from BMW financial on multiple occasions who verbalized the lease agreement does not explicitly state in the event of a total loss, BMW will keep the entirety of the pay off from the insurance company. Another agent agreed that the lease agreement "does not have the verbiage in the contract that would state the customer would not receive the remaining balance". This is a binding contract where an agreement was signed, but since the contract does not state this then BMW Financial can just take the money anyways? When signing the agreement, I was not warned of this potential outcome, nor is it in the lease agreement. How is it that this is okay? A giant company like BMW taking advantage of the customer because they are the small guy in the situation without the resources a company like BMW has. After the they received the full amount, making the 12k, they sent me a bill for a late monthly payment which was after the accident." (8/4/2023, https://www.yelp.ca/biz/bmw-financial-services-hilliard-2?hrid=0IDZ7V__N7FS7scO4_b-hw&utm_campaign=www_review_share_popup&utm_medium=copy_link&utm_source=(direct))

52.   As evidenced by the numerous complaints above, Defendants' scheme was maliciously

designed to induce consumers to lease vehicles. It does so by assuring consumers that the financial obligation under the lease contracts would be at the set sums not exceeding the down payment, monthly payments, and the lease end fee. Defendants give assurances of the flexibility to purchase the vehicles at any point in time for the remaining balance on the lease account and give the assurance that the consumers will keep any value above that balance as equity. However, when insurance proceeds arise out of accidents, collision, theft, or other similar circumstances resulting in total loss, BMW Financial Services surprises consumers by withholding the equity owed to them. BMW Financial Services further claims that the equity – collected from the insurers along with the vehicles' remaining balance and payments satisfying all the terms of the lease – belongs to it and consumers have consented to such terms. Nevertheless, consumers are either unaware of such terms or were misrepresented about the implications of such terms.

53.     Had Plaintiff known about the above-described scheme, he would have never agreed to lease the Subject Vehicle relying on Defendants. Plaintiff would have negotiated other terms or would have purchased the Subject Vehicle instead of leasing it.

54.     Dealership knew that Plaintiff wanted to lease the Subject Vehicle to purchase it later for a lower price. It knew that Plaintiff wanted to acquire equity in the Subject Vehicle. Dealership's personnel were also aware that this equity would be captured by BMW Financial Services in the event of a total loss. Nevertheless, they represented to Plaintiff that he would build equity in the Subject Vehicle and that equity would be his to benefit from at any time, at his discretion.

55.     As a result of the misrepresentations made by Defendants and the scheme devised by BMW Financial Services, Plaintiff has now lost the sum of $16,829.57. If he knew the statements were false sooner, he would have refinanced the Subject Vehicle as a purchase.

56.     In March 2023, as a result of the foregoing facts and to avoid extensive litigation, Plaintiff requested Defendants in writing to pay for his damages resulting from their violations of California law.

57.     The aforementioned written request was delivered to Defendants to the business addresses as attested by the United States Postal Services certified mail tracking receipts. Copies of the same were mailed to both addresses via regular mail as well.

58.     To date, Defendants have refused to pay for Plaintiff's damages.

59.     Plaintiff has been and will continue to be financially damaged due to the Defendants' failure to remedy the resulting damages from the unlawful conduct at the time of lease of the Subject Vehicle to Plaintiff.

<div align="center">

**FIRST CAUSE OF ACTION**

**FRAUD AND DECEIT**

*(Against All Defendants)*

</div>

60.     Plaintiff re-alleges and incorporates by reference as fully set forth herein all paragraphs of Plaintiff's Complaint for Damages.

61.     The particularity requirement for fraud requires the pleading of facts showing "how, when, where, to whom, and by what means the representations were tendered". *Stansfield v. Starkey*, 220 Cal.App.3d 59, 73 (Cal. Ct. App. 1990) citing *Hills Trans. Co. v. Southwest*, 266 Cal.App.2d 702 (Cal. Ct. App. 1968). Every element of fraud herein with specificity have been plead as follows:

a.  *How*: On or about 04/21/2020, Plaintiff visited Dealership with the intent to acquire a vehicle for personal use. Plaintiff spoke with Dealership's Salesperson and the Finance Manager, who were following the fraudulent scheme designed by Defendants to misrepresent the equity rights. Dealership's representatives verbally represented to Plaintiff that the financial obligation under the Lease would be at the set sums not to exceed the down payment, monthly payments, and the lease end fee. They assured that Plaintiff had a right to purchase the Subject Vehicle at any point in time for the remaining balance on the lease account while keeping any value above that balance as equity. These terms were laid out in the Lease. After the Subject Vehicle was deemed a total loss, BMW Financial Services collected the full amount of insurance proceeds from Farmers Insurance, including Plaintiff's equity of $16,829.57. BMW Financial Services' conduct fraudulently and directly contradicted the Lease terms.

b.  *When*: At the time Plaintiff leased the Subject Vehicle on or about 04/21/2020, and on the date BMW Financial Services received the insurance proceeds from Farmers Insurance and failed to remit Plaintiff's equity portion from the insurance payments. To this date, Defendants fraudulently withhold Plaintiff's equity portion.

c. *Where*: The oral discussions about the financial terms of the Lease took place at Dealership's location — 800 S. Brand Boulevard, Glendale, CA 91204. Additionally, the location at which BMW Financial Services received the insurance payments and immediately failed to remit Plaintiff's equity portion from the insurance payments.

d. *To Whom*: The statements were made to Plaintiff by the Defendants' representatives.

e. *What Means*: The discussions were made orally, by use of English language, simple words, as well as through wire transactions in connection to the failure to remit the equity payment to Plaintiff.

62. "The requirement of specificity in a fraud action against a corporation requires [Plaintiff] to allege the names of persons who made the allegedly fraudulent representations, their authority to speak, to whom they spoke, what they said or wrote, and when it was said or written." *Tarmann v. Farmers Insurance Mut. Auto. Ins. Co.*, 2 Cal.App.4th 153, 157 (Cal. Ct. App. 1991):

a. *Names of Persons*: Plaintiff spoke with Dealership's Salesperson and Finance Manager, who were following the fraudulent scheme designed by Defendants. Additionally, the persons with the authority and/or discretion to determine the disbursement amounts of the insurance payments received from insurance companies, the beneficiary individuals/entities and to implement the distribution of the insurance payments received from Farmers Insurance.

b. *Authority to Speak*: Defendants' representatives are responsible for speaking with and explaining the terms of the Lease to Plaintiff. They also have the authority and discretion to determine the disbursement amounts of the insurance payments received from insurance companies, the beneficiary individuals/entities and to implement the distribution of the said payments received from Farmers Insurance. Their authority to speak is self-evident in their job titles. Defendant's representatives were hired to effectuate the plot as designed by the Defendants' executives, including, but not limited to, ex-President and ex-Chief Executive Officer Ian Smith at BMW Financial Services, and Chief Executive Officer Eric Grombacher, Chief Financial Officer George Raysik at Dealership, to intentionally misrepresent the equity rights and fail

PLAINTIFF'S COMPLAINT FOR DAMAGES

to remit Plaintiff's equity portion from the insurance payments. The executives, by the very nature of their role within Defendants, had the authority to design and implement the fraudulent conduct and did so in fact.

    c. *To Whom They Spoke*: Defendants' representatives spoke with Plaintiff directly.

    d. *What They Said or Wrote*: Defendants told Plaintiff that he could terminate the Lease at any point in time paying all the outstanding fees pursuant to the Lease while keeping the equity accrued over time.

    e. *When It Was Said or Written*: At the time of leasing the Subject Vehicle on 04/21/2020. Additionally, on the date BMW Financial Services received the insurance proceeds from Farmers Insurance and failed to remit Plaintiff's equity portion from the insurance payments. To this date, Defendants fraudulently withhold Plaintiff's equity portion.

63. Cal. Civ. Code § 1710 identifies four kinds of fraud: (1) intentional misrepresentation, (2) concealment, (3) false promise, and (4) negligent misrepresentation.

64. Here, the fraud at hand is intentional misrepresentation, concealment, and false promise.

65. **Intentional misrepresentation** occurs when there are the following elements present: "(1) a misrepresentation of a material fact; (2) knowledge of falsity; (3) intent to induce reliance; (4) actual and justifiable reliance; and (5) resulting damage." *Chapman v. Skype Inc.*, 220 Cal.App.4th 217, 230 (Cal. Ct. App. 2013)

    (1) On 04/21/2020, Defendants, by and through their agents, intentionally misrepresented material facts to Plaintiff. Additionally, on the date BMW Financial Services received the insurance proceeds from Farmers Insurance and failed to remit Plaintiff's equity portion from the insurance payments. To this date, Defendants continue their fraudulent conduct. Defendants intentionally misrepresented to Plaintiff his equity portion, including, but not limited to, the following:

        • That the lease payments would reduce the principal balance on the Subject Vehicle, thereby allowing Plaintiff to eventually buy the Subject Vehicle any time for the reduced price based on the number of lease payments made to date,

- 18 -

PLAINTIFF'S COMPLAINT FOR DAMAGES

- Plaintiff would build equity in the Subject Vehicle and that equity would belong to her.

(2) Defendants made these representations knowing that they were false or made them recklessly and without regard for their truth. Defendants had knowledge of these material facts through sources not available to Plaintiff, including, but not limited to, early consumer complaints about the aforementioned equity rights, the aggregate data from the authorized dealers, and from other internal sources. Defendants had a duty to disclose the implications of the equity rights because:

- Defendants knew the representations made to Plaintiff were false [and/or made the representations recklessly and without regard for its truth] because they knew that in the event of a total loss BMW Financial Services would collect the full amount of the insurance proceeds including the equity built by Plaintiff. Defendants knew this by having their legal experts draft the terms of the Lease.

- Alternatively, in making such misrepresentations and committing such wrongful acts, Defendants acted with the conscious and reckless disregard to the truth or falsity of such misrepresentations and promises and wrongful acts. If Defendants had not foreseen the event of total loss, they should have modified the terms of the Lease after having received multiple consumer complaints regarding the implications of these terms.

(3) Defendants intended for Plaintiff to rely on the statement, and subsequently intended to defraud Plaintiff, since they wanted Plaintiff to lease the Subject Vehicle despite the terms regarding equity rights.

(4) Plaintiff reasonably relied on Defendants' assurances that he would build equity in the Subject Vehicle. Such reliance upon misrepresentations, material omissions, and/or wrongful acts was justified and reasonable under the circumstances. Defendants are established businesses with positive reputations and reassuring infrastructures which put Plaintiff at ease. This gave Plaintiff no reason to mistrust Defendants. The harm to Plaintiff was not otherwise inevitable or due to unrelated causes because Plaintiff would simply not have leased the

PLAINTIFF'S COMPLAINT FOR DAMAGES

Subject Vehicle at all and/or would have purchased it.

(5) As a direct and proximate result of the acts and omissions of Defendants, Plaintiff has suffered damages for which relief is sought herein. Specifically, damages include the equity amount of $16,829.57 (Disposition Fee ($350) plus the Adjusted Lease Balance ($47,287.13) minus the Realized Value of the Subject Vehicle ($64,466.70)), any and all incidental and consequential damages as a result of the Lease, which would not have taken place but for the fraudulent misrepresentations both prior to and at the time of lease.

66.   **Concealment** exists where a "(a) defendant suppressed a material fact; (b) the defendant was under a duty to disclose to plaintiff; (c) the fact was intentionally suppressed with intent to defraud; (d) plaintiff was unaware of the fact and would not have acted if the fact had been known; and (e) as a result of the concealment or suppression of the fact, the plaintiff must have sustained damage." *Salameh v. 5th and K Master Assn., Inc.*, D066096, at *7 (Cal. Ct. App. Sep. 23, 2015)

(a) On 04/21/2020, Defendants, by and through their agents, concealed, or suppressed the material fact that in the event of a total loss, BMW Financial Services would collect all the insurance proceeds including the equity Plaintiff built in the Subject Vehicle. Moreover, BMW Financial Services, by and through its agents, intentionally suppressed the material fact that it deliberately withheld and failed to remit Plaintiff's equity portion from the insurance payments to Plaintiff. To this date, Defendants fraudulently withhold Plaintiff's equity portion. BMW Financial Services collected $16,829.57 in equity from Plaintiff. Defendants assured the opposite to Plaintiff regarding the equity rights claiming that he would build equity over time and that equity would belong to her. Defendants made this representation knowing that it was false or made the representation recklessly and without regard for the truth. Defendants had knowledge of the material facts through sources not available to Plaintiff, including, but not limited to, early consumer complaints about the equity rights, the aggregate data from the authorized dealers, and from other internal sources.

(b) "The duty to disclose relevant information to a contractual party can arise as a result of the transaction itself within the parties' general obligation to deal in good faith." *Liebergesell v. Evans*, 93 Wn. 2d 881, 893 (Wash. 1980) Defendants are industry experts in sales and

distribution of motor vehicles and related equipment and services and therefore had knowledge of material facts regarding the Lease terms. This material fact was not within reasonably diligent attention, observation, and judgment of Plaintiff because Plaintiff has no professional expertise, has no legal background, and has very limited consumer experience in vehicle acquisition. Defendants thus had a "general obligation" to disclose the equity rights and its implications to Plaintiff. Further, under California law, a duty to disclose arises when "(1) when the defendant is in a fiduciary relationship with the plaintiff; (2) when the defendant had exclusive knowledge of material facts not known to the plaintiff; (3) when the defendant actively conceals a material fact from the plaintiff; and (4) when the defendant makes partial representations but also suppresses some material fact." *Falk v. General Motors Corp.*, 496 F. Supp. 2d 1088, 1904 (N.D. Cal. 2007) Here, (2) Defendants had exclusive knowledge of the material fact concerning the equity right and (3) it actively concealed this fact from Plaintiff assuring that he would build equity in the Subject Vehicle. (4) It assured that Plaintiff acquired this equity but suppressed the fact that it would be taken away from Plaintiff in the event of a total loss.

(c) Defendants intentionally concealed and suppressed this material fact to falsely assure Plaintiff that he would build equity rights in the Subject Vehicle as represented by Defendants and reasonably expected by consumers. Defendants omitted this material fact, with the intention to deceive, defraud, and induce Plaintiff into acting in reliance on the representations Defendants had made to Plaintiff. Defendants actively concealed or suppressed this material fact, in whole or in part, to protect/maximize their profits. They did so at the expense of Plaintiff.

(d) Plaintiff was unaware of these omitted material facts and would not have acted as he did if he had known of the concealed or suppressed facts. Plaintiff asked about the Lease terms, including equity rights, on or about 04/21/2020. Plaintiff did not receive the benefit of the bargain as a result of the Defendants' fraudulent concealment. This omitted and concealed fact was material because it would be relied on by a reasonable person leasing a new or used motor vehicle, and because it directly impacts the value of the Subject Vehicle acquired by

Plaintiff on or about 04/21/2020, as well as on or about the date BMW Financial Services received insurance payments and failed to remit Plaintiff's equity portion to Plaintiff. Plaintiff trusted Defendants not to lease him a vehicle on the terms allowing Defendants to collect what belongs to Plaintiff. Plaintiff had no reason to believe Defendants were hiding or intentionally misrepresenting information throughout the Lease term. Defendants lied, made misrepresentations, and did not disclose what they knew about the terms of the Lease.

(e) As a direct and proximate result of the acts and omissions of Defendants, Plaintiff has suffered damages for which relief is sought herein. Specifically, damages include the equity amount of $16,829.57 (Disposition Fee ($350) plus the Adjusted Lease Balance ($47,287.13) minus the Realized Value of the Subject Vehicle ($64,466.70)), which would not have taken place but for the fraudulent misrepresentations prior to and at the time of the lease, as well as at the time of the determination of total loss and distribution of insurance payments. Defendants committed concealment. Plaintiff is therefore entitled to recission and restitution in an amount according to proof at trial. Defendants' conduct was oppressive, fraudulent, and malicious, and constitutes despicable conduct in conscious disregard for Plaintiff's rights. Accordingly, Defendants are liable to Plaintiff for his damages in an amount to be proven at trial, including, but not limited to, the Plaintiff's lost benefit of the bargain.

67. A **false promise**, also known as "promissory fraud", occurs when a person makes a promise to do something "without any intention of performing it." *Union F. M. v. Southern Cal. F. M.*, 10 Cal.2d 671, 676 (Cal. 1938) "The elements of promissory fraud (i.e., of fraud or deceit based on a promise made without any intention of performing it) are: (1) a promise made regarding a material fact without any intention of performing it; (2) the existence of the intent not to perform at the time the promise was made; (3) intent to deceive or induce the promisee to enter into a transaction; (4) reasonable reliance by the promisee; (5) nonperformance by the party making the promise; and (6) resulting damage to the promise." *Behnke v. Farmers Insurance General Ins. Co.*, 196 Cal.App.4th 1443, 1453 (Cal. Ct. App. 2011):

(1) Through the terms found in the Lease ("A contract is a legally enforceable promise or set of promises." *Reichert v. Keefe Commissary Network, L.L.C.*, No. C17-5848RBL, at *3 (W.D. Wash. May 1, 2018)) and through continuous representations, Defendants promised to

Plaintiff that:

- the lease payments would reduce the principal balance on the Subject Vehicle, thereby allowing Plaintiff to eventually buy the Subject Vehicle any time for the reduced price based on the number of lease payments made to date,

- Plaintiff would build equity in the Subject Vehicle and that equity would belong to her.

(2) Defendants made the promises without any intention to perform such promises. Even if they were unaware of the implications of the Lease terms at the time of drafting them, the numerous complaints from consumers should have already notified them about such implications. The fact that Defendants neither tried to rectify the situation (did not try to remit the additional sum of money received from insurance proceeds) nor attempted to change the terms to after acknowledging their implications evinces the clear intent not to perform the promise made.

(3) The intent required for the fraud "is an intent to induce action". *Beckwith v. Dahl*, 205 Cal.App.4th 1039, 1063 (Cal. Ct. App. 2012) Here, Defendants, well aware of the Plaintiff's desire to build equity and of the falsity of their statements regarding the equity rights, had financial interest to induce Plaintiff to enter the Lease.

(4) Not being an expert in law, having no legal assistance at the time of entering the Lease, and counting on the experts in the automotive industry to deliver proper services, Plaintiff relied on the promises made by Defendants.

(5) By withholding the extra money received from insurance proceeds after the Subject Vehicle was declared a total loss, Defendants failed to fulfil their promises regarding the equity rights.

(6) As a result, Plaintiff, an individual of limited means, who wanted to lease the Subject Vehicle with the intent to purchase it later, suffered monetary damages in the amount of $16,829.57.

68.   Thus, Defendants committed fraud by giving false promises without any intent of performing them; by concealing, despite their duty to disclose, and misrepresenting the material fact regarding the equity rights, being fully aware that they would collect the equity in the event of a total loss, with the intent to induce Plaintiff to enter the Lease. Plaintiff, being no expert in the field, relied on Defendants'

expertise and knowledge, counted on them acting in good faith, and suffered damages as a result of their conduct.

69.     But for this fraudulent inducement, Plaintiff would not have leased the Subject Vehicle at all from Defendants, he would have purchased the Subject Vehicle instead of leasing it or visited another selling dealership.

70.     Plaintiff's reliance upon such misrepresentations, material omissions, and wrongful acts was justified and reasonable under the circumstances. Defendants are established businesses with a positive reputation and a reassuring infrastructure which put Plaintiff at ease. This gave Plaintiff no reason to mistrust Defendants.

71.     After all, Plaintiff clearly asked about the terms of the Lease and was assured that he could purchase the Subject Vehicle at any point by paying off the remaining balance and the lease ending fee. He was also reassured that he would build equity in the Subject Vehicle that would belong to him.

72.     Plaintiff's reliance upon such misrepresentations, material omissions, and wrongful acts was justified and reasonable because the representation from Defendants was material. On the other hand, Plaintiff had no bargaining rights or powers at the time of entering the Lease as it pertained to the equity rights. This was a contract of adhesion.

73.     After all these assurances, it is no surprise that Plaintiff was confused when BMW Financial Services collected the equity from insurance proceeds after the Subject Vehicle was declared a total loss.

74.     As a direct and proximate result of the acts and omissions of Defendants, Plaintiff suffered damages for which relief is sought herein.

75.     Plaintiff was not however the first individual to face these issues. Defendants have multiple complaints from former clients who experienced the same fraudulent and deceptive business practice.

76.     Therefore, Plaintiff is entitled to recover an award of punitive damages in order to deter and punish Defendants from repeating such conduct in the future.

///

///

///

///

PLAINTIFF'S COMPLAINT FOR DAMAGES

**SECOND CAUSE OF ACTION**

**BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**

*(Against All Defendants)*

77.     Plaintiff re-alleges and incorporates by reference as fully set forth herein all paragraphs of Plaintiff's Complaint for Damages.

78.     In every contract or agreement there is an implied promise of "good faith and fair dealing". *American Student Financial Group, Inc. v. Dade Medical College, Inc.*, 180 F. Supp. 3d 671, 679 (S.D. Cal. 2015) This implied promise means that each party will not do anything to unfairly interfere with the right of any other party to receive the benefits of the contract. *Uranga v. Continental Casualty Co.*, 2d Civil B205995 (Cal. Ct. App. Mar. 24, 2009) Good faith means honesty of purpose without any intention to mislead or to take unfair advantage of another. It means being faithful to one's duty or obligation. However, the implied promise of good faith and fair dealing cannot create obligations that are inconsistent with the terms of the contract. *Attenborough v. Reicher*, No. B218931 (Cal. Ct. App. Oct. 6, 2010)

79.     "To show a breach of this covenant, a plaintiff must show the following elements: (1) the existence of a contract; (2) plaintiff performed all, substantially performed, or was excused from performing his obligations under the contract; (3) all conditions for defendant's performance occurred; (4) defendant unfairly interfered with plaintiff's right to receive the benefits of the contract; and (5) plaintiff was harmed by defendant's conduct" *Gonzalez v. First Franklin Loan Services*, 1:09-CV-00941 AWI-GSA (E.D. Cal. Jan. 11, 2010)

   (1)   Here, Plaintiff and Defendants entered into a contract when Plaintiff agreed to lease the Subject Vehicle according to the terms found in and evidenced by the Lease.

   (2)   Plaintiff did all, or substantially all of the significant things that the Lease required him to do, or he was excused from having to do those things. After the Subject Vehicle had been deemed a total loss, Plaintiff filed a claim with the insurance company, which determined that the total replacement cost for the Subject Vehicle to be equal to $64,466.70 including the equity amount of $16,829.57. This amount was transferred to BMW Financial Services. Thus, Plaintiff paid all the various costs associated with the lease of the Subject Vehicle,

including the deductible amount.

(3) All conditions required for Defendants' performance occurred. BMW Financial Services received the adjusted lease balance equal to $47,287.13 and the disposition fee of $350 alongside the equity amount. BMW Financial Services could have transferred that amount to Plaintiff after receiving the respective amount. Additionally, in March 2023, Plaintiff, through his Counsel, notified Defendants about the violations and requested the equity amount in question. Nevertheless, to the date of filing this lawsuit, Defendants have failed to return Plaintiff his equity.

(4) Thus, Defendants, did not act fairly and in good faith. It unfairly interfered with Plaintiff's right to receive the benefits of the contract. BMW Financial Services collected the equity amount that belonged to Plaintiff and refuses to return it.

(5) As a result of the Defendants' conduct, Plaintiff lost his equity in the Subject Vehicle equal to $16,829.57.

80.    Consequently, Defendants breached the implied covenant of good faith and fair dealing inherent in the Lease by (1) failing to honor the financial terms of the Lease; (2) falsely representing that they would comply with the financial terms of the Lease; (3) attempting to collect a sum in excess of amounts owed under the Lease; (4) collecting sums in excess of amounts owed under the Lease and failing to release such sums to Plaintiff; (5) collecting sums ($16,829.57) in excess of the Adjusted Lease Balance ($47,287.13) for terminating the Lease involving the total loss claim ($64,466.70) paid by Plaintiff's insurance company and refusing to remit such sums to Plaintiff.

81.    Defendants' conduct prevents Plaintiff from receiving the benefits under the contract. Because Defendants breached the implied covenant of good faith and fair dealing when misrepresenting the equity rights, Plaintiff has never received the benefit of the bargain. Plaintiff did not willingly agree to getting his equity taken away, but rather was induced to lease the Subject Vehicle on these terms as Defendants unfairly interfered with the right of Plaintiff to receive the benefits of the contract. Defendants did not act in good faith because they were not honest and actively intended to mislead Plaintiff and take unfair advantage of her.

82.    As a direct and proximate result of the breach of the implied covenant of good faith and fair

dealing as alleged herein, Plaintiff suffered damages for which relief is sought herein.

**THIRD CAUSE OF ACTION**

**VIOLATION OF BUSINESS & PROFESSIONS CODE § 17200, ET SEQ.**

(*Against All Defendants*)

83.     Plaintiff re-alleges and incorporates by reference as fully set forth herein all paragraphs of Plaintiff's Complaint for Damages.

84.     Plaintiff has standing to bring this claim because Plaintiff lost money or property as a result of the misconduct alleged.

85.     A plaintiff has standing when he/she (1) loses or is deprived of money or property "sufficient to qualify as injury in fact, i.e., economic injury," and (2) the "economic injury was the result of, i.e., *caused by*, the unfair business practice or false advertising that is the gravamen of the claim." *Kwikset Corp. v. Superior Court*, 51 Cal.4th 310, 322 (Cal. 2011)

86.     Economic injury from unfair competition exists if a plaintiff "(1) surrender[s] in a transaction more, or acquires in a transaction less, than he or she otherwise would have; (2) ha[s] a present or future property interest diminished; (3) [is] deprived of money or property to which he or she has a cognizable claim; or (4) [is] required to enter into a transaction, costing money or property, that would otherwise have been unnecessary." *Id.* at 323.

87.     Here, (1) Plaintiff surrendered $16,829.57 more for the lease of the Subject Vehicle than he otherwise should have pursuant to the Lease. (3) As a result, he is deprived of the equity built in the Subject Vehicle which he has a right to own.

88.     Cal. Bus. & Prof. Code § 17200, *et seq.* prohibits any "unlawful, unfair, or fraudulent business act or practice."

89.     Defendants' acts, omissions, misrepresentations, practices, and non-disclosures constitute unlawful, unfair, and fraudulent business acts and practices within the meaning of Cal. Bus. & Prof. Code § 17200, *et seq.*

90.     A business act or practice is **<u>unlawful</u>** if among other things it violates civil or criminal statutes, as well as federal and state statutes and municipal regulations. *Sybersound Records, Inc. v. UAV Corp.*, 517 F.3d 1137, 1151 (9th Cir. 2008) Defendants have engaged in **<u>unlawful</u>** business acts and

practices by (1) failing to honor the financial terms of the Lease; (2) falsely representing that they would comply with the financial terms of the Lease; (3) attempting to collect a sum in excess of amounts owed under the Lease; (4) collecting sums in excess of amounts owed under the Lease and failing to release such sums to Plaintiff; (5) collecting sums ($16,829.57) in excess of the Adjusted Lease Balance ($47,287.13) for terminating the Lease involving the total loss claim ($64,466.70) paid by Plaintiff's insurance company and refusing to remit such sums to Plaintiff.

91.     These acts and practices were intended to and did violate Cal. Civ. Code § 1709, *et seq.*; Cal. Civ. Code § 1750, *et seq.*; and Cal. Veh. Code § 11713.19.

- Cal. Civ. Code § 1709 states that "one who willfully deceives another with intent to induce him to alter his position to his injury or risk, is liable for any damage which he thereby suffers." Defendants willfully deceived Plaintiff in their representations regarding the financial terms of the Lease to induce Plaintiff to lease the Subject Vehicle.

- Cal. Civ. Code § 1750, *et seq.* protects consumers from false advertising, representations, and other unfair business practices. Cal. Civ. Code § 1770(a)(14) states the following as an example of an "unfair method of competition and unfair or deceptive act[] or practice[]": "Representing that a transaction confers or involves rights, remedies, or obligations that it does not have or involve, or that are prohibited by law." Defendants violated § 1750, *et seq.* by misrepresenting the equity rights to Plaintiff.

- Cal. Veh. Code § 11713.19(a)(1) states that it is "unlawful and a violation of this code" to "negotiate the terms of a vehicle sale or lease contract and then add charges to the contract for any goods or services without previously disclosing to the consumer the goods and services to be added and obtaining the consumer's consent." The extras have to be disclosed to the consumer and the consumer has to consent in writing to these extras. Defendants told Plaintiff that he should not pay anything more than the remaining balance and the lease ending fee but then overcharged him in the amount of his equity. Furthermore, Plaintiff did not consent to this charge.

92.     "By statutory definition, any illegal business practice is also unfair." *Webster v. Omnitrition Intern., Inc.*, 79 F.3d 776, 788 (9th Cir. 1996) A business act or practice is **unfair** if it

"offends an established public policy or is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers." *Lauter v. Anoufrieva*, 642 F. Supp. 2d 1060, 1096 (C.D. Cal. 2009) Defendants have engaged in **<u>unfair</u>** business acts or practices in that the justification for leasing vehicles based on the misrepresentations and omissions of material facts delineated above is outweighed by the gravity of the resulting harm, particularly considering the available alternatives, and offends public policy, is immoral, unscrupulous, unethical, and offensive, or causes substantial injury to consumers. The business scheme employed by Defendants, is immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers because it induces consumers to lease vehicles with the assurance of equity right being built over time, but which ends up at BMW Financial Services' possession, as is clear by the outcome with Plaintiff.

93.   A business act is unfair if (1) there is a substantial consumer injury, (2) there are not any countervailing benefits to consumers or competition outweighing the injury, and (3) the injury could not reasonably have been avoided by consumers. 15 U.S.C. § 45*, Daugherty v. American Honda Motor Co., Inc.*, 144 Cal.App.4th 824, 839 (Cal. Ct. App. 2006)

(1) "… [I]n order to satisfy the first prong of substantial consumer injury, the injury must be caused by the allegedly unfair practice." *Johnson v. Deutsche Bank Nat'l Trust Co.*, No. B223188, at *15 (Cal. Ct. App. Aug. 23, 2011) Further "substantial injury" requirement necessitates "that a person who brings an action under section 17200 must have sustained an injury in fact." *Camacho v. Automobile Club of Southern California*, 142 Cal.App.4th 1394, 1404 (Cal. Ct. App. 2006) Defendants failed to honor the financial terms of the Lease while falsely representing that they would comply with them. After the Subject Vehicle was deemed a total loss and BMW Financial Services received the insurance proceeds, it collected a sum in excess of amounts owed under the Lease. To this date, Defendants have failed to release these sums to Plaintiff. As a result of Defendants' actions, Plaintiff lost his equity in the amount of $16,829.57.

(2) Plaintiff's injury is not outweighed by any countervailing benefits to consumers or competition. "[W]hen a practice produces clear adverse consequences for consumers that are not accompanied by an increase in services or benefits to consumers or by benefits to

competition, the unfairness of the practice is not outweighed." *Gardner v. Allstate Ins. Co.*, No. B188985 (Cal. Ct. App. July 24, 2007) (citation omitted). Collecting what belongs to consumers does in no way "increase" any "services or benefits" thus confirming the lack of any countervailing benefits.

(3) Plaintiff specifically inquired about the equity rights. Defendants knowingly lied to Plaintiff to induce the lease of the Subject Vehicle. "[Plaintiff] cannot have reasonably avoided the injury if [he] could not have reasonably anticipated the injury..." *Camacho v. Automobile Club of Southern California*, 142 Cal.App.4th 1394, 1405 (Cal. Ct. App. 2006) "Anticipatory avoidance through consumer choice was impossible" as the Lease did not indicate that BMW Financial Services would collect the equity as result of total loss, or for any other reason. *Orkin Exterminating Co., Inc. v. F.T.C*, 849 F.2d 1354, 1365 (11th Cir. 1988) Plaintiff had no other "means to avoid the injury" and could not have "mitigated the damage afterward" as no "potential avenues toward that end" were provided. *Id*. 1362. In fact, Plaintiff attempted to mitigate the damage caused by Defendants by sending a notice of violations and requesting compensation, but his efforts were unsuccessful. Plaintiff's injury, therefore, could not reasonably have been avoided by Plaintiff.

94.    A business act or practice is **fraudulent** if it is "likely to deceive the public". *Rubenstein v. Gap, Inc.*, 14 Cal.App.5th 870, 876 (Cal. Ct. App. 2017) (citation omitted). Defendants have engaged in **fraudulent** business acts or practices in that the representations and omissions of material fact described above have a tendency and likelihood to deceive lessees of these vehicles and the general public "by failure to disclose other relevant information", as is clear by the outcome with Plaintiff. *Leon v. Watsonville Hosp. Corp.*, No. H037288, at *29 (Cal. Ct. App. May 9, 2013)

- An advertisement or promotional practice is likely to deceive if it includes assertions that are (1) untrue, or (2) true "[but are] either actually misleading or which [have] a capacity, likelihood or tendency to deceive or confuse the public." (*Kasky v. Nike, Inc*. 27 Cal.4th 939, 951 (2002), citing *Leoni v. State Bar,* 39 Cal.3d 609, 626 (1985).)

- Defendants' practice of making false promises regarding equity rights, misrepresenting

and failing to disclose properly the financial terms of the lease agreements is likely to deceive members of the public because the statements are untrue. It is inconceivable to think that consumers will be able to see through Defendants' false promises/misrepresentations and know that they are lying and that these terms are unconscionable. Besides, "unless we can say as a matter of law that contrary to the complaint's allegations, members of the public were not likely to be deceived or misled by respondents' packaging materials, we must hold that [Plaintiff] stated a cause of action." *Day v. AT & T Corp.*, 63 Cal.App.4th 325, 333 (Cal. Ct. App. 1998)

95.   In sum, Plaintiff sought the best deal to eventually own the Subject Vehicle and was told by Defendants that he could lease it and gain equity over time. However, when a total loss occurred, BMW Financial Services collected the equity that belonged to Plaintiff.

96.   The concealment, intentional misrepresentations, and false promises made by Defendants to Plaintiff during the Lease negotiations constitute an unlawful, unfair, and fraudulent scheme designed to deceive him into believing that he would build equity in the Subject Vehicle.

97.   Defendants committed these unlawful, unfair, and fraudulent acts with conscious and reckless disregard for the truth or falsity of such misrepresentations, promises, concealment and wrongful acts and in violation of Cal. Civ. Code § 1709*, et seq.*; § 1750, *et seq*; Cal. Veh. Code § 11713.19; and Cal. Bus. & Prof. Code § 17200*, et seq.*

98.   As a direct and proximate result of Defendants' conduct, Plaintiff has suffered substantial consumer damage with no countervailing benefits outweighing it and which could not have been reasonably avoided.

99.   Plaintiff has suffered damages in the equity amount of $16,829.57 (Disposition Fee ($350) plus the Adjusted Lease Balance ($47,287.13) minus the Realized Value of the Subject Vehicle ($64,466.70)), and any and all incidental and consequential damages as a result of the Lease, which would not have taken place but for Defendants' concealment, false promises, and intentional misrepresentations.

100.   Thus, Plaintiff seeks relief for these damages.

101.   Furthermore, the acts of Defendants as herein described present a continuing threat to members of the general public in that Defendants continue to engage in these deceptive practices and

will not cease doing so unless and until an injunction is issued by the Court.

102.    Defendants have failed to publicly acknowledge the wrongfulness of their actions and provide full equitable injunctive and monetary relief as required by statute.

103.    If Defendants are allowed to continue to engage in these deceptive practices other consumers will also lease vehicles by being tricked into believing they will build an equity which would belong to them regardless of circumstances. Instead, these consumers would enter lease contracts with unconscionable terms, which would allow Defendants to collect money belonging to consumers.

104.    In accordance with the provisions of Cal. Bus. & Prof. Code §§ 17200 and 17203, Plaintiff seeks an order of this Court requiring Defendants to immediately cease such acts of unfair competition and enjoining Defendants from continuing to conduct business via the unlawful, unfair, deceptive, and/or fraudulent business acts and practices set forth in this Complaint and from failing to disclose the true nature of their misrepresentations and ordering Defendants to engage in a corrective notice and advertising campaign.

105.    Plaintiff further seeks attorney's fees under Cal. Civ. Proc. Code § 1021.5.

## FOURTH CAUSE OF ACTION

## VIOLATION OF BUSINESS & PROFESSIONS CODE § 17500, ET SEQ.

*(Against All Defendants)*

106.    Plaintiff re-alleges and incorporates by reference as fully set forth herein all paragraphs of Plaintiff's Complaint for Damages.

107.    Plaintiff has standing to bring this claim because Plaintiff lost money or property as a result of the misconduct alleged.

108.    Cal. Bus. & Prof. Code § 17500*, et seq.* prohibits unfair, deceptive, untrue, and misleading advertising in connection with the disposal of personal property (among other things), including, but not limited to, false statements as to worth, value, and former price.

109.    The business scheme employed by Defendants is unfair, deceptive, untrue, and misleading because the communications and statements regarding the financial terms of the Lease and the equity gain are not only false but are also made with the intent to effectively bait and switch consumers, including Plaintiff, into leasing vehicles. *See Wood v. Honey Baked Ham, Inc.*, No. B261248 at *8 (Cal.

Ct. App. Nov. 8, 2016) ["A 'bait and switch' is a form of false advertising in which advertisements may not be bona fide because what the merchant intends to sell is significantly different from that which drew the potential customer in."]

110.   Defendants, by and through Salesperson and the Financial Manager, deceived Plaintiff by stating that the financial obligation under the Lease would be at the set sums not to exceed the down payment, monthly payments, and the lease end fee. They further deceived Plaintiff that he had a right to purchase the Subject Vehicle at any point in time for the remaining balance on the lease account while keeping any value above that balance as equity.

111.   In reliance on these statements, Plaintiff leased the Subject Vehicle with the intent to ending up owning it. Thereafter, when the Subject Vehicle was declared as a total loss, Plaintiff discovered that BMW Financial Services collected the equity amount he was told would belong to him.

112.   This was all part of a methodical extortion scheme designed and implemented by Defendants against Plaintiff and other similarly situated consumers. Defendants intentionally made the previously alleged misrepresentations and promises, devised, and executed a scheme to defraud Plaintiff, and did so resulting in damage to Plaintiff with the conscious and reckless disregard to the truth or falsity of such.

113.   In making such misrepresentations and wrongful acts, Defendants committed acts of untrue and misleading advertising as defined in Cal. Bus. & Prof. Code § 17500.

114.   Defendants knew, or should have known, that Plaintiff would rely on Defendants' assurances as they are experts in the industry and because Plaintiff constantly told Defendants he wanted to end up owning the Subject Vehicle. "As indicated, if the defendant 'has reason to expect' that his material misstatements or nondisclosures would be passed on to and relied upon by the plaintiffs, he is liable to them." *Geernaert v. Mitchell*, 31 Cal.App.4th 601, 609 (Cal. Ct. App. 1995)

115.   Plaintiff did in fact rely on Defendants' deceptive, untrue, and misleading communications and statements and suffered damages as a direct result. "[T]he rule of equity is that where there has been a fraudulent misrepresentation or a willful concealment of facts by means of which a person has been induced to enter into a contract to subscribe, in the absence of circumstances tending to excite suspicion in the mind of a reasonable man he may rightfully rely upon the statements to which the other party to the contract or the agent of such other party has deliberately pledged his faith." *Tidewater Southern*

*Railway Company v. Harney*, 32 Cal. App. 253, 260 (Cal. Ct. App. 1916) (citation omitted)

116.   Plaintiff leased the Subject Vehicle under the belief that he would build equity and eventually own it, but Defendants' deceptive communication resulted in him surrendering more in the transaction than he would have. Defendants assured Plaintiff that the financial obligation under the Lease would be at set sums, but when the Subject Vehicle was deemed a total loss, BMW Financial Services claimed, that pursuant to the Lease, it had to collect the insurance proceeds fully, including the portion exceeding the Plaintiff's obligation under the Lease amounting to $16,829.57.

117.   The Lease, however, did not seem to include terms regulating the responsibilities of the Parties being involved in the circumstances surrounding this action. The Lease required Plaintiff to pay the disposition fee, the Adjusted Lease Balance, and the amount by which the latter exceeds the Realized Value of the Subject Vehicle. Nothing was said regarding the event of the Realized Value of the Subject Vehicle exceeding the Adjusted Lease Balance in the event of it being deemed a total loss. Plaintiff never consented to giving out that amount to Defendants. *McElroy v. Tenet Health Care Corp.*, No. G047300, at *12 (Cal. Ct. App. Aug. 21, 2013) [consent to pay more "cannot be inferred from an agreement that is silent on the subject"]

118.   Nevertheless, Defendants, who initially promised Plaintiff that he would gain equity in the Subject Vehicle, claimed otherwise after the Subject vehicle was deemed a total loss. At the time of signing the Lease, Plaintiff had no choice but to rely on the misrepresentations and assurances made by Defendants and was thus tricked into believing that he would gain equity by leasing the Subject Vehicle.

119.   As a direct result of the aforementioned acts, Defendants have received, and continue to unjustly hold, collect, or accept revenues derived directly or indirectly from Plaintiff, through untrue and misleading representations and advertising.

120.   Defendants' unfair, deceptive, untrue, misleading communications and advertising of the financial terms of the Lease described above present a continuing threat to members of the general public in that Defendants persist and continue to engage in these practices with respect to the general public and will not cease doing so unless and until an injunction is issued by this Court.

121.   If Defendants are allowed to continue to engage in these deceptive practices other consumers will also be tricked into believing they would gain equity when leasing vehicles. Instead, these consumers

PLAINTIFF'S COMPLAINT FOR DAMAGES

will be deprived of their equity rights, because of the unconscionable terms of the lease agreements prepared by Defendants.

122.     Thus, in accordance with the provisions of Cal. Bus. & Prof. Code §§ 17500 and 17535, Plaintiff requests the Court to issue an order enjoining the acts of untrue and misleading advertising and representations described herein and directing Defendants to make full restitution to Plaintiff, who has suffered from such acts.

123.     As a direct and proximate result of Defendants' conduct, Plaintiff has suffered damages for which relief is sought herein.

124.     Plaintiff has suffered damages in the equity amount of $16,829.57 (Disposition Fee ($350) plus the Adjusted Lease Balance ($47,287.13) minus the Realized Value of the Subject Vehicle ($64,466.70)), and any and all incidental and consequential damages as a result of the Lease, which would not have taken place but for Defendants' fraudulent misrepresentations.

125.     Plaintiff also seeks to recover his attorney's fees under Cal. Civ. Proc. Code § 1021.5.

## FIFTH CAUSE OF ACTION

## VIOLATION OF CALIFORNIA CONSUMER LEGAL REMEDIES ACT

### (*Against All Defendants*)

126.     Plaintiff re-alleges and incorporates by reference as fully set forth herein all paragraphs of Plaintiff's Complaint for Damages.

127.     This cause of action is brought pursuant to Cal. Civ. Code § 1751, *et seq.* ("CLRA").

128.     The Subject Vehicle is a "good" under the CLRA that was bought primarily for personal, family, or household purposes as defined in the CLRA in Cal. Civ. Code § 1761(a).

129.     Plaintiff is a "consumer" as defined in the CLRA in § 1761(d).

130.     The Lease is a "transaction" as defined in the CLRA in § 1761(e).

131.     Defendants violated California law, including the CLRA, by: (1) failing to honor the financial terms of the Lease; (2) falsely representing that they would comply with the financial terms of the Lease; (3) attempting to collect a sum in excess of amounts owed under the Lease; (4) collecting sums in excess of amounts owed under the Lease and failing to release such sums to Plaintiff; (5) collecting sums ($16,829.57) in excess of the Adjusted Lease Balance ($47,287.13) for terminating the Lease involving

the total loss claim ($64,466.70) paid by Plaintiff's insurance company and refusing to remit such sums to Plaintiff. The above acts and violations are believed to be a pattern and practice by Defendants to engage in these activities.

132.   Defendants' actions, representations, and conduct have violated, and continue to violate, the CLRA, because they extend to transactions that are intended to result, or which have resulted, in the lease of goods or services to consumers.

133.   The following "unfair methods of competition and unfair or deceptive acts or practice undertaken by any person in a transaction intended to result or that results in the sale or lease of goods or services to any consumer are unlawful: (5) Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that the person does not have. (9) Advertising goods or services with intent not to sell them as advertised. (14) Representing that a transaction confers or involves rights, remedies, or obligations that it does not have or involve, or that are prohibited by law. (17) Representing that the consumer will receive a rebate, discount, or other economic benefit, if the earning of the benefit is contingent on an event to occur subsequent to the consummation of the transaction. (19) Inserting an unconscionable provision in the contract." Cal. Civ. Code § 1770(a).

> (5)   Defendants misrepresented the financial terms of the Lease by claiming that it would provide a benefit of equity to Plaintiff that the Lease did not actually provide.

> (9)   Defendants advertised that the financial obligations for terminating the Lease were limited to the Adjusted Lease Balance and the disposition fee but did not intend to follow through with this statement and ended up taking more than the necessary amount.

> (14)   Defendants assured Plaintiff that the Lease conferred the right of equity in the event of Plaintiff deciding to purchase the Subject Vehicle by paying the Adjusted Lease Balance and the disposition fee. However, Defendants later tried to deny this and imposed an additional financial obligation on Plaintiff to pay the full sum of insurance proceeds, including the equity that belonged to Plaintiff after the Subject

Vehicle was deemed a total loss. This additional obligation was neither discussed with nor approved by Plaintiff during the negotiation or execution of the Lease.

(17) Defendants misrepresented the alleged economic benefit of equity by failing to disclose that this equity would be taken away from Plaintiff if the Subject Vehicle is deemed a total loss.

(19) Although Defendants insist that Plaintiff had to pay the insurance proceeds fully, including the equity, pursuant to the Lease, Plaintiff does not agree with this interpretation of the Lease. Assuming arguendo, Defendants' interpretation is correct, then the Court shall not enforce the Lease and deem it in full or its clauses regarding the termination of the Lease unconscionable. *See* Cal. Civ. Code § 1670.5; U.C.C. § 2A-108 (AM. L. INST. & UNIF. L. COMM'N 1977). Unconscionability refers to "an absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party." (*A & M Produce Co. v. FMC Corp.*, 135 Cal.App.3d 473, 485 (Cal. Ct. App. 1982).) Unconscionability involves procedural and substantial elements. The Lease is an "adhesive contract" which was drafted by BMW Financial Services, "a party with superior bargaining strength", and presented to Plaintiff, "the weaker party on a take it or leave it basis" *Alexander v. Professional Exchange Service Corp.*, No. F059647 (Cal. Ct. App. Apr. 20, 2011). This proves the procedural element of unconscionability. *Elite Logistics Corp. v. Wan Hai Lines, Ltd.,* No. B252543, at *13 (Cal. Ct. App. June 4, 2015) "Substantively unconscionable terms may take various forms but may generally be described as unfairly one-sided." *Little v. Auto Stiegler, Inc.*, 29 Cal.4th 1064, 1071 (Cal. 2003) The Lease had to contain at least 'a modicum of bilaterality' to avoid unconscionability. *Abramson v. Juniper Networks, Inc.*, 115 Cal.App.4th 638, 658 (Cal. Ct. App. 2004) (citation omitted). Here, to terminate the Lease Plaintiff may purchase the Subject Vehicle by paying the Adjusted Lease Balance, the disposition fee, and the difference between Adjusted Lease Balance and Realized Value of the Subject Vehicle if the former is

PLAINTIFF'S COMPLAINT FOR DAMAGES

negative. However, according to Defendants, they do not need to return to Plaintiff the difference even when it is positive. Defendants do not give any "reasonable justification for that lack of symmetry". *Id*. This "unilateral obligation" proves that the Lease or its clause regarding termination "lacks the requisite degree of mutuality" and hence is unconscionable. *Nyulassy v. Lockheed Martin Corp.*, 120 Cal.App.4th 1267, 1286 (Cal. Ct. App. 2004)

134.    Defendants thus violated the CLRA by misrepresenting the financial terms of the Lease, by making false promises regarding the equity rights to Plaintiff and concealing/failing to disclose that they would collect the equity in the event of a total loss, with the intent to induce Plaintiff to enter the Lease fraught with unconscionability.

135.    Defendants have an illegal pattern and practice of: (1) failing to honor the financial terms of the Lease; (2) falsely representing that they would comply with the financial terms of the Lease; (3) attempting to collect a sum in excess of amounts owed under the Lease; (4) collecting sums in excess of amounts owed under the Lease and failing to release such sums to Plaintiff; and (5) collecting sums ($16,829.57) in excess of the Adjusted Lease Balance ($47,287.13) for terminating the Lease involving the total loss claim ($64,466.70) paid by Plaintiff's insurance company and refusing to remit such sums to Plaintiff.

136.    If Defendants are not restrained from engaging in these types of practices in the future, Plaintiff and other members of the general public will continue to suffer harm.

137.    As a direct and proximate result of the violation of the CLRA as alleged herein, Plaintiff suffered damages for which relief is sought herein. Cal. Civ. Code § 1780(a).

138.    Pursuant to Cal. Civ. Code § 1782(a), in March 2023, Plaintiff sent to Defendants a written notice of violation of the CLRA by certified mail, to Defendants' places of business. This notice and demand notified Defendants of their violations of the CLRA that resulted in the lease of the goods to Plaintiff and demanded Defendants to remedy such violations promptly.

139.    Within thirty (30) days of receipt of the notice and demand (in fact to date), Defendants failed to correct, repair, replace, or otherwise remedy within a reasonable time the above-mentioned violations.

140.    On behalf of the general public, Plaintiff requests that an injunction against Defendants be

issued to enjoin them from continuing to engage in the unlawful conduct alleged herein, namely collecting the full insurance proceeds that exceed consumers' liabilities, and in fact belong to them as their equity.

141.   Plaintiff is also entitled to recover attorney's fees and costs under the CLRA in connection with this litigation. *See* Cal. Civ. Code § 1780(e).

<center>**PRAYER FOR RELIEF**</center>

Wherefore, Plaintiff prays for a judgment as follows:

      a.  For recovery of the greater of actual damages according to proof, if adequate, as appropriate;

      b.  For recovery of all incidental damages, as appropriate;

      c.  For recovery of all consequential damages, as appropriate;

      d.  For recovery of punitive damages, as appropriate;

      e.  For restitution, as appropriate;

      f.  For injunctive relief, as appropriate;

      g.  For recovery of interest at the legal rate, as appropriate;

      h.  For all reasonable attorney's fees and the aggregate amount of costs reasonably incurred pursuant to California's Private Attorney General Statute, Cal. Civ. Proc. Code § 1021.5, as appropriate; or

      i.  For reasonable attorney's fees and costs under Cal. Civ. Code § 1780(e);

      j.  For recovery of $168,916.53 in damages; and

      k.  Such other and further relief that the Court deems just and appropriate.

**PLAINTIFF HEREBY REQUESTS A JURY TRIAL AS TO ALL QUESTIONS SO TRIABLE.**

DATED: 11/29/2023

<div style="margin-left:40%">THE MARGARIAN LAW FIRM<br>462 West Colorado Street<br>Glendale, California 91204<br><br>By <u>*/s/ Hovanes Margarian*</u><br>Hovanes Margarian<br>Attorney for Plaintiff<br>HAGOB BOYADJIAN</div>

## DECLARATION OF HOVANES MARGARIAN PURSUANT TO CAL. CIV. CODE § 1780(d)

I, HOVANES MARGARIAN, declare as follows:

1.      I am an attorney at law duly licensed to practice before all courts of the State of California and am the principal attorney at the Margarian Law Firm, one of the counsels of record for Plaintiff. I have personal knowledge of the matters set forth below and if called upon as a witness could and would competently testify thereto.

2.      I am informed and believe that venue is proper in this court pursuant to Cal. Civ. Code § 1780(d) based on the following facts:

      a.  Defendants have performed transactions at issue in this action, or has obtained financial benefit from such transactions, at all times relevant to this action, in Orange County, California; and

      b.  At all relevant times herein, Plaintiff resides in Los Angeles County, California.

WHEREFORE, I declare under the penalty of perjury under the laws of the State of California that the foregoing is true and correct, and that this Declaration was executed on 11/29/2023 in Glendale, California.

THE MARGARIAN LAW FIRM
462 West Colorado Street
Glendale, California 91204

By */s/ Hovanes Margarian*
Hovanes Margarian
Attorney for Plaintiff
HAGOB BOYADJIAN

**EXHIBIT A**

PLAINTIFF'S COMPLAINT FOR DAMAGES

# BMW Financial Services NA, LLC - LEASE AGREEMENT
## Motor Vehicle Lease Agreement (Closed End) - California

### 1. PARTIES

| Lessor (Center) Name and Address | Lessee and Co-Lessee Name and Address | Vehicle Garaging Address (if Different) |
|---|---|---|
| **CREVIER BMW**<br>**1500 AUTO MALL DRIVE**<br>**SANTA ANA CA 92705**<br>**(714) 835-3171** | HAGOB BOYADJIAN | N/A |
| | | Billing Address (if Different)<br>N/A |

**THERE IS NO COOLING OFF PERIOD. California law does not provide for a "cooling off" or other cancellation period for vehicle leases. Therefore, you cannot later cancel this lease simply because you change your mind, decided the vehicle costs too much, or wish you had acquired a different vehicle. You may cancel this lease only with the agreement of the lessor or for legal cause, such as fraud.**

**2. Agreement to Lease.** This Motor Vehicle Lease Agreement ("Lease") is entered into between the lessee and co-lessee ("Lessee") and the lessor ("Lessor") named above. Unless otherwise specified, "I," "me" and "my" refer to the Lessee and "you" and "your" refer to the Lessor or Lessor's assignee. "Vehicle" refers to the leased vehicle described below. "Assignee" refers to BMW Financial Services NA, LLC ("BMW FS") or, if this box is checked ☒ to Financial Services Vehicle Trust. BMW FS will administer this Lease on behalf of itself or any assignee. The consumer lease disclosures contained in this Lease are made on behalf of Lessor and its successors or assignees.

**3. Date of Lease, Lease Term and Scheduled Maturity Date.** This Lease is entered into on 04/21/2020 for the scheduled Lease Term of ___36___ months with a Scheduled Maturity Date of 04/21/2023.

### 4. VEHICLE DESCRIPTIONS

| A. Leased Vehicle<br>☒New ☐ Demo<br>☐ Used | Model Year<br>2020 | Make & Model<br>BMW SAV<br>X5 40SI | VIN<br>5UXCR4C06L9B32154 | | Odometer<br>36 | Primary Use: ☒Personal, Family or Household<br>☐ Business, Commercial or Agricultural |
|---|---|---|---|---|---|---|
| ☐ Telephone | ☐ CD Player | ☐ N/A (specify) | ☐ N/A (specify) | ☐ N/A (specify) | | |
| **B. Trade-In** | Model Year<br>N/A | Make<br>N/A | Model<br>N/A | Agreed Upon Value<br>N/A | Prior Credit or Lease Balance<br>N/A | Net Trade-In Value<br>N/A |

This box is for use by original Lessor and me to memorialize trade-in, turn-in and other individualized agreements. If none, enter "None" or "N/A". Assignee will not be obligated for agreements disclosed in this box.

Lessee agrees that if this lease cannot be assigned by Dealer to a financial institution on terms acceptable to Dealer and Dealer gives Lessee notice within 10 days, this lease will be rescinded. Lessee must then return the vehicle to Dealer in good condition and Dealer will then return to Lessee all consideration paid.

X H.b



2204L (7/13) (CA)

| **5. AMOUNT DUE AT LEASE SIGNING OR DELIVERY** (Itemized in Section 9) | **6. MONTHLY PAYMENTS** | **7. OTHER CHARGES** (Not part of my Monthly Payments) | **8. TOTAL OF PAYMENTS** (The amount I will have paid by the end of the Lease Term) |
|---|---|---|---|
| $ _____ 2000.00 | My first monthly payment of $ ____ 880.64 ____ is due on 04/21/20 followed by __35__ payments of $ ____ 880.64 ____ due on the __21st__ day of each month. The total of my monthly payments is $ 31,703.04 . | A. Disposition Fee (if I do not purchase the Vehicle) $ 350.00<br>B. N/A $ N/A<br><br>TOTAL $ 350.00 | $ _____ 33172.40 |

## 9. ITEMIZATION OF AMOUNT DUE AT LEASE SIGNING OR DELIVERY

**A. Amount Due at Lease Signing or Delivery**

| | | |
|---|---|---|
| 1. | Capitalized Cost Reduction | $ 250.02 |
| 2. | First Monthly Payment | $ 880.64 |
| 3. | Refundable Security Deposit | $ N/A |
| 4. | Initial Title Fees | $ N/A |
| 5. | Initial Registration Fees | $ 308.00 |
| 6. | Initial License Fees | $ 405.00 |
| 7. | Sales/Use Tax | $ 8.71 |
| 8. | Acquisition Fee (if not capitalized) | $ N/A |
| 9. | Electronic Vehicle Registration or Transfer Charge (not a governmental fee) (if not capitalized) Paid to: AVRS | $ 30.00 |
| 10. | Sales Tax on Capitalized Cost Reduction | $ 25.63 |
| 11. | Document Processing Charge (not a governmental fee) (if not capitalized) | $ 85.00 |
| 12. | California Tire Fee | $ 7.00 |
| 13. | Theft Deterrent Device | $ N/A |
| 14. | Theft Deterrent Device | $ N/A |
| 15. | Surface Protection Product | $ N/A |
| 16. | Surface Protection Product | $ N/A |
| 17. | N/A | $ N/A |
| 18. | N/A | $ N/A |
| 19. | N/A | $ N/A |
| 20. | N/A | $ N/A |
| | TOTAL | $ 2000.00 |

**B. How the Amount Due at Lease Signing or Delivery Will Be Paid**

| | | |
|---|---|---|
| 1. | Net Trade-In Allowance | $ N/A |
| 2. | Rebates and Noncash Credits | $ 2000.00 |
| 3. | Amount to be Paid in Cash | $ N/A |
| | TOTAL | $ 2000.00 |

## 10. MY MONTHLY PAYMENT IS DETERMINED AS SHOWN BELOW

**A. Gross Capitalized Cost.** The agreed upon value of the Vehicle ($ 62320.00 ) and any items I pay for over the Lease Term (such as taxes, fees, service contracts, insurance, and any outstanding prior credit or lease balance) (See Section 13 for an itemization of this amount). $ 63245.00

**B. Capitalized Cost Reduction.** The amount of any net trade-in allowance, rebate, noncash credit, or cash I pay that reduces the Gross Capitalized Cost. – $ 250.02

**C. Adjusted Capitalized Cost.** The amount used in calculating my Base Monthly Payment. = $ 62994.98

**D. Residual Value.** The value of the Vehicle at the end of the Lease used in calculating my Base Monthly Payment. – $ 38553.20

**E. Depreciation and any Amortized Amounts.** The amount charged for the Vehicle's decline in value through normal use and for other items paid over the Lease Term. = $ 24441.78

**F. Rent Charge.** The amount charged in addition to the Depreciation and any Amortized Amounts. + $ 4313.94

**G. Total of Base Monthly Payments.** The Depreciation and any Amortized Amounts plus the Rent Charge. = $ 28755.72

**H. Lease Payments.** The number of payments in my Lease. ÷ 36

**I. Base Monthly Payment.** = $ 798.77

**J. Sales/Use Tax.** + $ 81.87

**K. N/A** + $ N/A

**L. Total Monthly Payment.** = $ 880.64

**Early Termination.** I may have to pay a substantial charge if I end this Lease early. The charge may be up to several thousand dollars. The actual charge will depend on when the Lease is terminated. The earlier I end the Lease, the greater this charge is likely to be.

**11. Excessive Wear and Use.** I may be charged for excessive wear based on your standards for normal use and for mileage in excess of total miles over the scheduled Lease Term of ____ 30000 ____ miles, at the rate of ____ 25 ____ cents per mile.

**12. Purchase Option at End of Lease Term.** I have an option to purchase the Vehicle ("as is") at the Scheduled Termination of the Lease for its Residual Value of $ ____ 38553.20 . The purchase option price does not include official fees, such as those for taxes, title, registration and license/tags. See Section 27 for more information.

**Other Important Terms.** See all pages of this Lease for additional information on early termination, purchase options, and maintenance responsibilities, warranties, late and default charges, insurance, and any security interest, if applicable.

## 13. ITEMIZATION OF GROSS CAPITALIZED COST

| | | | | |
|---|---|---|---|---|
| A. | Agreed Upon Value of Vehicle as Equipped at the Time of Lease Signing | $ 62320.00 | H. Document Processing Charge (not a governmental fee) $ N/A | |
| B. | Agreed Upon Value of Each Accessory and item of Optional Equipment Original Lessor Agrees to Add to the Vehicle after Lease Signing | | I. Maintenance Agreement $ N/A | |
| | N/A | $ N/A | J. Mechanical Breakdown Protection $ N/A | |
| | N/A | $ N/A | K. Extended Warranty $ N/A | |
| | N/A | $ N/A | L. Service Contract $ N/A | |
| | N/A | $ N/A | M. Prior Credit or Lease Balance* $ N/A | |
| C. | Total Agreed Upon Value of Vehicle | $ 62320.00 | N. Electronic Vehicle Registration or Transfer Charge (not a governmental fee) $ N/A | |
| D. | Initial Title, License & Registration Fees | $ N/A | O. Acquisition Fee $ 925.00 | |
| E. | Sales/Use Tax | $ N/A | P. Other N/A $ N/A | |
| F. | Federal Luxury Tax | $ N/A | Q. Other N/A $ N/A | |
| G. | Sales Tax on Capitalized Cost Reduction | $ N/A | R. Other N/A $ N/A | |
| | | | TOTAL GROSS CAPITALIZED COST (C through R) $ 63245.00 | |
| | | | *Leave blank unless Lessor has paid prior credit or lease balance. | |

## 14. ESTIMATED OFFICIAL FEES AND TAXES

$ . . . 5091.66 This is an estimate of the total amount I agree to pay for official and license fees, registration, title and taxes (including personal property taxes) over the Lease Term, whether included in my Monthly Payment, Amount Due at Lease Signing or Delivery, or separately billed. The actual total of Official Fees and Taxes may be higher or lower, depending on the tax rates in effect or the value of the Vehicle at the time a fee or tax is assessed. This estimate is based on my Garaging Address and may increase if I move or if tax rates change. For some of these items, you may invoice me after the taxing authority has billed you, sometimes after the lease terminates.

## 15. OPTIONAL PRODUCTS AND SERVICES

I am not required to buy any of the optional products and services listed below. These products and/or services will not be provided unless I check the appropriate box, fill in all necessary information, initial below and I am accepted by the Provider. Because these products and or services are not provided by the Lessor, I understand that I must pursue all related matters, including refunds, through the listed Provider. By initialing below, I agree that I have received and read a notice of the terms of the product or service and I want to obtain the product or service for the charge shown. A portion of the charge may be retained by Lessor (Center).

| | | | | |
|---|---|---|---|---|
| ❑ Maintenance Agreement | N/A | N/A | $ N/A | N/A |
| | Provider | Term (Months) | Charge | Lessee/Co-Lessee Initials |
| ❑ Mechanical Breakdown Protection | N/A | N/A | $ N/A | N/A |
| | Provider | Term (Months) | Charge | Lessee/Co-Lessee Initials |
| ❑ N/A | N/A | N/A | $ N/A | N/A |
| | Provider | Term (Months) | Charge | Lessee/Co-Lessee Initials |

**Mileage Allowance/Refund.**

30036   I agree to this Mileage Allowance for the term of this Lease. My Monthly Payment and Residual Value for this Lease have been
Enter Mileage            calculated, in part, by using this Mileage Allowance.
❑ If this box is checked, I have elected a high Mileage Allowance. I may receive a refund of ____ N/A ____ cents per unused mile for the unused miles between ____ N/A ____ miles and ____ N/A ____ miles, unless (a) the Vehicle is considered a total loss under my insurance coverage due to damage, theft or destruction, (b) I default, (c) I terminate this Lease early, (d) I purchase the Vehicle, or (e) the refund is less than $1. Any refund will be reduced by any amount I owe under this Lease at the Scheduled Termination.

## 16. WARRANTIES

The Vehicle is subject to the following express warranties. If the Vehicle is new, the Vehicle is subject to the standard manufacturer's new vehicle warranty. The Vehicle is also covered by the following, if checked:
❑ Remainder of the standard manufacturer's new vehicle warranty if the Vehicle is not a new vehicle.
❑ N/A

**UNLESS A LESSOR'S WARRANTY IS DISCLOSED ABOVE, LESSOR, TO THE EXTENT PERMITTED BY LAW, (1) MAKES NO WARRANTIES OR REPRESENTATIONS, EITHER EXPRESSED OR IMPLIED, AS TO THE VEHICLE OR ANY OF ITS PARTS OR ACCESSORIES AND (2) MAKES NO WARRANTY OF MERCHANTABILITY OR FITNESS OF THE VEHICLE FOR ANY PARTICULAR PURPOSE. I ACKNOWLEDGE THAT I AM LEASING THE VEHICLE FROM THE LESSOR "AS IS."**

## 17. INSURANCE VERIFICATION

I agree to maintain the insurance coverage described in <u>Section 20</u>. I affirm that such insurance is in force on the date of this Lease. I authorize Lessor and its assignees to speak to my insurance agent or company, and any future insurance agents or companies, about my coverage for the leased Vehicle.

| N/A  Farmer's Ins Co | N/A | | |
|---|---|---|---|
| Insurance Company | Policy No. | | Coverage Verified (Center Employee's Initials) |
| N/A  Vartan Safarian | N/A | N/A | |
| Agent Name | Address | Phone No. | |

All matters regarding insurance should be sent by e-mail to insuranceinfo@bmwfs.com or faxed to 888-725-8456.

## MY OBLIGATIONS DURING THIS LEASE

**18. Vehicle Use.** I agree not to use (or permit others to use) the Vehicle: (a) in any way that violates the law or the terms of my insurance policy or this Lease; (b) to transport goods or people for hire, lease or rental to others; (c) outside the state where it was first titled for more than 30 days without your prior written consent; or (d) outside the United States, except for less than 30 days in Canada. I will not allow an uninsured person to operate the Vehicle at any time, or allow any third party, other than my spouse, to operate the Vehicle without written permission from you. I will not physically change the Vehicle's body or interior in any way unless I first get your written consent.

**19. Vehicle Maintenance, Service, Repairs, and Reconditioning.** I agree to maintain, service, repair, and recondition the Vehicle during the Lease Term with new and genuine manufacturer's original equipment replacement parts as recommended in the Vehicle owner's manual. I will keep complete maintenance records and return them with the Vehicle.

I am responsible for repairs of all collision, accident, and other physical damage that is not a result of normal wear and use. These repairs include, but are not limited to, those necessary to return the Vehicle to its pre-damage condition, including, but not limited to, repairing damage to exterior panels and components, structural components, vehicle safety systems such as airbag systems and seatbelts, and the Vehicle's interior. All repairs must be made with new and genuine manufacturer's original equipment replacement parts. I will discuss these requirements with my insurance company prior to signing

my insurance agreement, damage repair estimate, or before authorizing any damage repair work. If I have not had the repairs made before the Vehicle is returned at or before the end of the scheduled Lease Term, I will pay the estimated cost of such repairs to restore the Vehicle to its pre-damage condition, even if the repairs are made after the Vehicle is returned.

If the Vehicle's odometer becomes inoperative or malfunctions, I agree to notify you and have the odometer repaired within 30 days. I agree not to make any alterations that decrease the Vehicle's value or usefulness or that violate the law. If I add non-standard equipment to the Vehicle, I will return it to original manufacturer specifications before the end of the Lease Term. If the non-standard equipment cannot be removed or modified without decreasing the Vehicle's value or usefulness when the Vehicle is returned to you, the equipment will become your property, and I may be billed in accordance with <u>Section 32</u> below. You may inspect the Vehicle at any reasonable time.

**NO PHYSICAL DAMAGE OR LIABILITY INSURANCE COVERAGE FOR BODILY INJURY OR PROPERTY DAMAGE CAUSED TO OTHERS IS INCLUDED IN THIS LEASE.**

**20. Required Insurance.** During the term of this Lease and until I return the Vehicle, I agree to maintain the following types and amounts of primary insurance: (a) personal liability for bodily injury or death to any one person for

2204L (7/13) (CA)

not less than $100,000 and Totally one occurrence [or not less than $300,000]

(b) property damage liability for not less than $50,000; (c) comprehensive liability, including fire and theft, for the Vehicle's actual value (payable in cash and not by a replacement vehicle) with a maximum deductible of $1,000; (d) collision liability for the Vehicle's actual value (payable in cash and not by a replacement vehicle) with a maximum deductible of $1,000. The coverage will name you as an additional insured and loss payee. I will provide you with at least 30 days advance notice of cancellation. You have the right to endorse my name on any insurance check or settlement you receive. You also have the right to speak to my insurance company about my insurance coverage.

Except to the extent required by the motor vehicle financial responsibility laws of the applicable state or otherwise by law, I acknowledge that you do not extend any of your motor vehicle financial responsibility or provide insurance coverage to me, any authorized additional driver(s), passengers or third parties through this Lease. If valid automobile liability insurance or self insurance is available on any basis for me, additional authorized driver(s) or any other driver and such insurance or self insurance satisfies the applicable state motor vehicle financial responsibility law, then you extend none of your motor vehicle financial responsibility. However, if I and any additional authorized driver(s) are in compliance with the terms and conditions of this Lease and if you are obligated to extend your motor vehicle financial responsibility to me, any additional authorized driver(s) or third parties, then your obligation is limited to the applicable state minimum financial responsibility amounts. Unless required by law, your financial responsibility shall not extend to any claim made by any passenger while riding in or on or getting in or out of the Vehicle. Your financial responsibility shall not extend to liability imposed or assumed by anyone under any worker's compensation act, plan or contract.

Except as required by law, you do not provide Personal Injury Protection, No Fault Benefits or Medical Payment Coverage (PIP) or Uninsured/ Underinsured Motorist Protection (UM/UIM) through this Lease. If you are required by law to provide PIP and/or UM/UIM, I expressly select such protection in the minimum limits with maximum deductible and expressly waive and reject PIP and/or UM/ UIM limits in excess of the minimum limits required by law.

**21. Registration, Titling, and Taxes.** I agree to pay registration, title, license, inspection fees and other official fees and taxes in connection with the Vehicle when due, including taxes imposed on fees such as, but not limited to, the disposition fee. You may, at your discretion, pay these fees or taxes to protect your interest in the Vehicle. If you pay such fees or taxes on my behalf, I agree to reimburse you when I am billed. If I fail to reimburse you within 60 days after I am billed, then I will pay you a monthly late charge, until the unpaid balance of the fees and taxes has been paid in full. The amount of each such late charge will not exceed 1.5% of the outstanding unpaid balance of the fees and taxes then due, or the maximum permitted by law, whichever is less. The remedies described in this Section 21 are in addition to any remedies you may have pursuant to Section 23.

If I move to another location during the Lease Term or it becomes necessary for you to correct any title or registration deficiencies, or to perfect your interest in the Vehicle, whether as a result of my failure to cooperate or other action or inaction on my part, I agree to pay you a $30 service charge in addition to the actual fees or taxes, unless prohibited by law, to process registration, title and license documents.

**22. Payments, Late Charge, Returned Payment Charge, Fines, and Traffic Tickets.** If you do not receive my total Monthly Payment within 10 days after it is due, I agree to pay a late charge of $30 or 5% of the amount of the payment that is late, whichever is greater, but not to exceed any limit under applicable law. If any payment is returned to you unpaid for any reason, or if any electronic debit authorization is not paid, I agree to pay you a $25 service charge per item when I am billed.

If you receive notice of any third-party charges related to the Vehicle (including but not limited to fines, traffic tickets, parking tickets, toll violations, towing fees, storage fees, or repair bills), I will pay you a $30 service charge per item whether or not you pay such third-party charges. You may, at your discretion, pay these charges to protect your interest in the Vehicle. If you pay such charges on my behalf, I agree to reimburse you when I am billed. If I fail to reimburse you within 60 days after I am billed, then I will pay you a monthly late charge, until the unpaid balance of such third-party charges has been paid in full. The amount of each such late charge will not exceed 1.5% of the outstanding unpaid balance of the third-party charges then due, or the maximum amount permitted by law, whichever is less. I further agree to pay you any and all costs you incur associated with my failure to pay such fines, charges or traffic tickets, including legal costs and reasonable attorneys' fees as allowed by applicable law. The remedies described in this Section 22 are in addition to any remedies you may have pursuant to Section 23.

**23. Default and Remedies.** I will be in default under this Lease if:
    (a)   I fail to make a Monthly Payment when due;

(c)   I fail to return the Vehicle at the end of the Lease Term;
(d)   I fail to keep any of my promises under this Lease;
(e)   I abandon the Vehicle;
(f)   I or a guarantor become(s) insolvent or die(s);
(g)   Any information in my credit application or a guarantor's credit application is false or misleading; or
(h)   The Vehicle is subject to or threatened by seizure, confiscation, levy, or other involuntary transfer by governmental, administrative or legal process.

If I am in default, you may do any or all of the following:
(i)   Terminate this Lease and my rights to possess and use the Vehicle;
(ii)   Take possession of the Vehicle by any method permitted by law;
(iii)   Pursue any other remedy permitted by law;
(iv)   Dispose of any personal or other property in the Vehicle at the time of repossession if I do not reclaim it within 10 days;
(v)   Require that I pay the sum of: (1) any past due Monthly Payments; plus (2) any official fees and taxes assessed or billed in connection with this Lease and the Vehicle and any other amounts needed to satisfy my obligations under this Lease except Excess Wear and Use and Excess Mileage charges; plus (3) the amount by which the Adjusted Lease Balance (explained in Section 30) exceeds the Realized Value of the Vehicle (Section 31); plus (4) all of your expenses for taking these actions, including, but not limited to expenses for repossession, transportation, storage, and/or sale of the Vehicle; plus (5) all fees and costs of collections, including reasonable attorneys' fees, court costs, interest, and other related expenses involving the enforcement of the terms and conditions of the this Lease, the protection or defense of your interest in the Lease or Vehicle and all losses you incur in connection with my default of this Lease whether such action is in law, equity or an administrative remedy. Furthermore, if I do not pay these amounts when you ask, you may charge me interest at a rate not exceeding the highest lawful rate until I pay;
(vi)   If the Vehicle has an electronic tracking device, I agree that you may use the device to find the Vehicle.

**24. Vehicle Loss or Damage.** I agree to immediately notify you if the Vehicle is damaged or destroyed in an accident, stolen, abandoned, or taken by a police or other governmental agency. In that event, you reserve the right to terminate this Lease and my liability will either be: (a) calculated under Section 25 below, if I am in compliance with my insurance obligations; or (b) calculated under Section 23 above, if I am not in compliance with my insurance obligations. If the Vehicle is stolen or destroyed, another vehicle may be substituted in its place only if you agree to the substitution. You have no obligation to provide a substitution vehicle. If the Vehicle is damaged and you do not terminate this Lease because the Vehicle is reasonably repairable, I agree to make the repairs in accordance with Section 19 above at my expense.

**25. "Gap Amount" Waiver.** If I am in compliance with my insurance obligations under this Lease and the Vehicle is damaged, stolen or destroyed and considered a total loss under my insurance coverage, I will not be obligated to pay you the gap amount (the difference between the Adjusted Lease Balance and the actual cash value of the Vehicle as of the date of loss) if the claim for total loss is actually paid to you by my insurance company. However, I will be obligated to pay you: (1) any and all amounts due and owing needed to satisfy my obligations under this Lease (including past due Monthly Payments and any official fees and taxes assessed or billed in connection with this Lease and the Vehicle); plus (2) any amounts (including Monthly Payments) that become due pending receipt of the insurance proceeds, plus (3) the deductible amount under my insurance policy, plus (4) any amounts deducted from the actual cash value of the Vehicle by the insurance carrier. If as of the date of loss, I do not have a physical damage insurance policy that complies with the insurance requirements set forth in this Lease, no gap amount waiver applies and the amount of my liability will be determined as set forth in Section 23.

**26. Power of Attorney.** I appoint you, to the extent permitted by law, through your officer or employee, as my attorney-in-fact. My grant of this power of attorney is coupled with an interest, and is irrevocable until all obligations I owe under this Lease are paid in full. As my attorney-in-fact, you can sign on my behalf all Certificates of Ownership, Registration Cards, applications, affidavits, or any other documents required to register and properly perfect your interest in the Vehicle; transfer my entire interest in the Vehicle as part of a repossession and sale; act on my behalf in insurance matters relating to the Vehicle, including, but not limited to, the power to endorse insurance proceeds checks or drafts on my behalf; and cancel any Credit Life, Credit Disability, GAP Coverage, Extended Warranty, or other optional insurance financed under this Lease, and apply the refunded premium or cost to my outstanding balance if I am in default. Should an original power of attorney be necessary to accomplish any of the preceding, I agree to execute a separate identical power of attorney document and provide you with same.

## ENDING MY LEASE

**27. Purchase Option.** I have an option to purchase the Vehicle AS-IS, WHERE-IS. If I want to buy the Vehicle, I will notify you in advance and agree to complete any documents you require for the purchase. I also agree to re-register and re-title the Vehicle at my own expense in my name at the time I purchase it. If I fail to do so, you reserve the right to cancel the registration. At the Scheduled Termination of the Lease, the purchase price will be the Residual Value (Section 10.D). Prior to the end of the Lease Term, the purchase price will be the Adjusted Lease Balance (Section 30). In either case, I agree to also pay any other amounts due or outstanding under the Lease at the time of purchase such as any official fees, unpaid Monthly Payments or late charges.

**28. Vehicle Return.** If I do not purchase the Vehicle, I agree to return it to the place you specify with all parts and accessories and in good working order. Upon return, I agree to complete and sign an odometer disclosure statement and a vehicle inspection report, which may be used in determining any excess wear and use and/or excess mileage. If I do not return the Vehicle at the end of my Lease Term, I am in default and will continue to pay an amount equal to the Monthly Payment for each month until the time that I return the Vehicle. Payment of this amount does not give me the right to keep the Vehicle nor does it automatically extend this Lease.

**29. Scheduled Termination of the Lease.** Unless I terminate my Lease early or purchase the Vehicle, my Lease will terminate on the Scheduled Maturity Date, at which time, I agree to pay you: (a) a $350 Disposition Fee, plus (b) any unpaid Monthly Payments then due and other amounts needed to satisfy my obligations under this Lease, plus (c) any Excess Mileage and Excess Wear and Use charges (Section 11), plus (d) any official fees or taxes assessed or billed in connection with this Lease.

**30. Early Termination of the Lease.** I may terminate this Lease at any time by purchasing the Vehicle (Section 27) or by returning the Vehicle to a location selected by you, if I am in full compliance with the Lease and satisfy all of my Early Termination obligations. If I do not purchase the Vehicle, I may choose one of the following options to determine my Early Termination liability:

**Option A.** I agree to pay the sum of: (1) all remaining Monthly Payments; plus (2) any past due Monthly Payments; plus (3) any official fees and taxes assessed or billed in connection with this Lease and the Vehicle and any other amounts needed to satisfy my obligations under this Lease; plus (4) any Excess Wear and Use and Excess Mileage Charges; plus (5) a $350 Disposition Fee. However, should my Early Termination Liability calculated under this Option exceed what I would have owed had I selected Option B, you will waive the difference and my liability will be capped at Option B.

**Option B.** I agree to pay the sum of: (1) any past due Monthly Payments; plus (2) any official fees and taxes assessed or billed in connection with this Lease and the Vehicle and any other amounts needed to satisfy my obligations under this Lease except Excess Wear and Use and Excess Mileage charges; plus (3) a $350 Disposition Fee; plus (4) the amount by which the Adjusted Lease Balance (explained below) exceeds the Realized Value of the Vehicle (Section 31).

Under either option, you may apply some or all of my Security Deposit to what I owe and I will remain liable for personal property taxes that may be assessed and/or billed after the Lease terminates.

The "Adjusted Lease Balance" is determined at any given time by subtracting the scheduled Base Monthly Payments earned through the early termination date from the Adjusted Capitalized Cost and adding to the difference the cumulative Rent Charge earned through the early termination date. The Rent Charge is calculated according to the "constant yield method". Under the constant yield method, each month's rent charge is earned in advance by multiplying the constant rate implicit in the Lease times the Adjusted Lease Balance. The Rent Charge calculations are based on the assumption that Lessor will receive the Monthly Payments on the exact due date.

**31. Realized Value of the Vehicle.** For the purpose of calculating my Early Termination liability (Section 30), the Realized Value of the Vehicle is (a) the price you receive for the Vehicle upon disposition in a commercially reasonable manner or (b) a price agreed to by you and me in a separate writing. If the Vehicle is a total loss as set forth in Section 24 above and I am in compliance with my insurance obligations, the amount of any deductible and the proceeds of the settlement of the insurance claim you receive are the "Realized Value." The Realized Value may also be determined by an appraisal of the wholesale value of the Vehicle, which I may obtain, at my own expense from a professional, independent appraiser agreeable to both of us. If I obtain such an appraisal not later than 3 days before the date of scheduled disposition of the Vehicle by you, the appraisal will be the final and binding Realized Value.

**32. Excessive Wear and Use.** I agree to pay you the costs of all repairs to the Vehicle that are not the result of normal wear and use, whether or not you actually repair the Vehicle. Excessive wear and use includes, but is not limited to:

(a) inoperative electrical or mechanical parts;
(b) dented, scratched, chipped, rusted, pitted, broken or mismatched body parts, paint, vehicle identification items, trim or grill work;
(c) non-functioning, scratched, cracked, pitted or broken glass or lights;
(d) missing equipment, parts, accessories or adornments;
(e) torn, damaged, burned, or stained interior;
(f) repair of any damage that makes the Vehicle unlawful or unsafe to drive;
(g) damage due to installation or removal of non-manufacturer, after-market or replacement parts;
(h) damage (including damage to the engine) due to failure to maintain the Vehicle in accordance with Section 19; or
(i) tires with tread depth of less than 1/8" remaining at the shallowest point, and/or tires that are not all of the same grade, quantity or quality as those delivered with the Vehicle.

If I fail to pay any excess wear and use, excess mileage or other lease end charges within thirty days of the due date indicated on my end of lease bill, I will pay you interest on the unpaid balance of these charges at the rate of 18 percent per annum, if permitted by law, or the maximum rate permitted if less, until paid in full.

I agree to pay state and local taxes that may be due on amounts owed for lease end charges, including but not limited to excess wear and use and excess mileage fees.

## ADDITIONAL INFORMATION

**33. Indemnification.** I agree to indemnify, defend and hold you harmless from all claims, liabilities, suits, losses, damages and expenses (including attorney's fees and court costs) including, but not limited to, claims concerning the condition, maintenance, use, ownership or operation of the Vehicle, or claims made under the strict liability doctrine.

**34. Refundable Security Deposit.** You may use some or all of my Security Deposit to pay any amount I owe under this Lease at the end of my Lease Term or upon early termination of the Lease. I will not earn any interest on my Security Deposit. After I have paid all my obligations under this Lease, you will refund to me any part of my Security Deposit that is not used to pay what I owe you.

**35. Assignment.** You may assign your interests under this Lease without my consent. I MAY NOT TRANSFER OR SUBLEASE THIS VEHICLE TO A THIRD PARTY OR ASSIGN THE LEASE OR ANY RIGHTS UNDER IT WITHOUT YOUR PRIOR WRITTEN APPROVAL, WHICH YOU MAY WITHHOLD IN YOUR SOLE JUDGMENT.

**36. Notices.** All correspondence and notices will be sent to me at my Billing Address shown on this Lease unless I give you a different address in writing.

**37. Other Terms.** Waiver. You may waive or delay enforcement of your rights under this Lease without affecting your rights on future defaults. Severability. Any part of this Lease that is not enforceable shall not affect the validity of the remainder of this Lease. Joint Liability. If more than one Lessee signs this Lease, each Lessee shall be jointly and severally liable for all obligations under this Lease. Choice of Law. Except as may otherwise be provided by law, this Lease will be subject to the laws of the state where I sign it. In the event that both parties agree not to arbitrate in accordance with Section 38 below, any dispute shall be brought in a court located in the state where I signed the Lease. Entire Agreement. This Lease describes all agreements between us with respect to the Lease of the Vehicle. All prior agreements, whether oral or in writing, are superseded. Maintaining Payments. I may not change or stop any Monthly Payments for any reason, even if I do not receive an invoice, and even if the Vehicle is stolen, destroyed, seized by the government or the court, experiences mechanical problems, or does not satisfactorily perform. Lessee's Warranties. I represent that my driver's license and the driver's license of any authorized driver has not been revoked or suspended within the last 5 years. I promise that I have given a true Amount Owed for any vehicle traded in. If the correct Prior Credit or Lease Balance is more than the amount shown in Section 4.B, I agree to pay you the excess amount upon demand. Personal Property. Lessor shall not be responsible at any time for any personal

2204L (7/13) (CA)

Case 24-cv-01820   Document 1   Filed 01/09/24   Page 49 of 58 PageID #: 689

in the Vehicle. **Escheatment** – If you need to escheat any of my funds to an unclaimed funds department, you may retain such fee as allowable per state law.

## 38. ARBITRATION CLAUSE

### PLEASE REVIEW - IMPORTANT - AFFECTS OUR LEGAL RIGHTS

**NOTICE:** Either you or I may choose to have any dispute between us decided by arbitration and not in a court or by jury trial. If a dispute is arbitrated, I will give up my right to participate as a class representative or class member on any Claim I may have against you including any right to class arbitration or any consolidation of individual arbitrations. Discovery and rights to appeal in arbitration are generally more limited than in a lawsuit, and other rights you and I would have in court may not be available in arbitration.

**"Claim"** broadly means any claim, dispute or controversy, whether in contract, tort, statute or otherwise, whether preexisting, present or future, between me and you or your employees, officers, directors, affiliates, successors or assigns, or between me and any third parties if I assert a Claim against such third parties in connection with a Claim I assert against you, which arises out of or relates to my credit application, lease, purchase or condition of this Vehicle, this Lease or any resulting transaction or relationship (including any such relationship with third parties who do not sign this Lease). Any Claim shall, at your or my election, be resolved by neutral, binding arbitration and not by a court action. However, "Claim" does not include any dispute or controversy about the validity, enforceability, coverage or scope of this Arbitration Clause or any part thereof (including, without limitation, the Class Action Waiver set forth below and/or this sentence); all such disputes or controversies are for a court and not an arbitrator to decide. But any dispute or controversy that concerns the validity or enforceability of the Lease as a whole is for the arbitrator, not a court, to decide. In addition, "Claim" does not include any individual action brought by me in small claims court or my state's equivalent court, unless such action is transferred, removed or appealed to a different court. Moreover, this Arbitration Clause will not apply to any Claims that are the subject of (a) a class action filed in court that is pending as of the effective date of this Arbitration Clause in which I am alleged to be a member of the putative class (however, you and I will continue to be bound by any prior Arbitration Clause) or (b) a motion to compel arbitration filed by you against me before the effective date of this Arbitration Clause pursuant to a prior Arbitration Clause (however, you and I will continue to be bound by any prior Arbitration Clause).

**Class Action Waiver. Notwithstanding any other provision of this Lease or Arbitration Clause, if either you or I elect to arbitrate a Claim, neither you nor I will have the right: (a) to participate in a class action, mass action, private attorney general action or other representative action in court or in arbitration, either as a class representative or class member; or (b) to join or consolidate Claims with claims of any other persons. No arbitrator shall have authority to conduct any arbitration in violation of this provision. (Provided, however, that the Class Action Waiver does not apply to any lawsuit or administrative proceeding filed against you by a state or federal government agency even when such agency is seeking relief on behalf of a class of lessees including me. This means that you will not have the right to compel arbitration of any claim brought by such an agency). The Class Action Waiver is material and essential to the arbitration of any Claims between the parties and is nonseverable from this Arbitration Clause. If the Class Action Waiver is limited, voided or found unenforceable, then this Arbitration Clause (except for this sentence) shall be null and void with respect to such proceeding, subject to the right to appeal the limitation or invalidation of the Class Action Waiver. The parties acknowledge and agree that under no circumstances will a class action be arbitrated.**

I may choose the American Arbitration Association ("AAA"), 120 Broadway, New York, NY 10271, www.adr.org, 1-800-778-7879 or JAMS, 1920 Main Street, Suite 300, Irvine, CA 92614, www.jamsadr.com, 1-800-352-5267 to administer the arbitration. The rules and forms of the AAA and JAMS may be obtained on their websites or by writing to these organizations at the addresses listed above. Either you or I may request an expedited hearing under the applicable rules. If the AAA and JAMS are unable or unwilling to serve as administrator, the parties may agree upon another administrator or, if they are unable to agree, a court shall determine the administrator. No company may serve as administrator, without the consent of all parties, if it adopts or has in place any formal or informal policy that is inconsistent with and purports to override the terms of this Arbitration Clause. If the chosen administrator's rules or other provisions of this Lease (including any other arbitration provision relating to this Lease) conflict with this Arbitration Clause, then the provisions of this Arbitration Clause shall control. If a party files a lawsuit in court asserting

a Claim(s) that are subject to arbitration and the other party files a motion to compel arbitration with the court which is granted, it will be the responsibility of the party prosecuting the Claim(s) to select an arbitration administrator in accordance with this paragraph and commence the arbitration proceeding in accordance with the administrator's rules and procedures.

Arbitrators shall be attorneys with at least ten years of experience or retired judges and shall be selected pursuant to the applicable rules. The arbitrator will not be bound by judicial rules of procedure and evidence that would apply in a court, nor by state or local laws that relate to arbitration proceedings. The arbitrator will honor statutes of limitation and claims of privilege recognized under applicable law. In determining liability or awarding damages or other relief, the arbitrator will follow the applicable substantive law, consistent with the FAA (Federal Arbitration Act), that would apply if the matter had been brought in court, including, without limitation, punitive damages (which shall be governed by the Constitutional standards employed by the courts). The arbitrator may award any damages or other relief or remedies permitted by applicable law including equitable, temporary and/or provisional remedies. The arbitrator shall write a brief explanation of the grounds for the decision. Any arbitration hearing that I attend shall be conducted at a place reasonably convenient to where I reside. Any court having jurisdiction may enter judgment on the arbitrator's award.

In any arbitration that I have commenced against you, if the total amount of my Claim(s) is less than $25,000: (a) you will pay any and all fees of the administrator and/or the arbitrator if I make a written request for you to pay such fees; and (b) you will pay my reasonable attorneys' and expert witness fees and costs if and to the extent I prevail in the arbitration. Moreover, you will always bear any fees and costs (including administrator and arbitrator fees and reasonable attorneys' and expert witness fees and costs) that you are required to bear pursuant to the administrator's rules or applicable law. You will not seek reimbursement from me of any fees or costs (including administrator and arbitrator fees and attorneys' and expert witness fees and costs) that you incur on your own behalf or pay on my behalf in connection with the arbitration.

This Lease involves interstate commerce and this Arbitration Clause and any arbitration hereunder shall be governed by the Federal Arbitration Act, 9 U.S.C. § 1 et seq. ("FAA") and not by any state law concerning arbitration. However, the governing law as to the substantive issues of the Lease and Vehicle shall be the law of the state in which this Lease was executed. The arbitrator's award shall be final and binding on all parties, except for any right of appeal provided by the FAA. However, if the amount of the Claim exceeds $50,000 or involves a request for injunctive or declaratory relief that could foreseeably involve a cost or benefit to either party exceeding $50,000, any party can, within 30 days after the entry of the award by the arbitrator, appeal the award to a three-arbitrator panel administered by the administrator. The panel shall reconsider anew any aspect of the initial award requested by the appealing party. The decision of the panel shall be by majority vote. Reference in this arbitration provision to "the arbitrator" shall mean the panel if an appeal of the arbitrator's decision has been taken. The costs of such an appeal will be borne in accordance with the preceding paragraph. Any final decision of the appeal panel is subject to judicial review only as provided under the FAA.

You and I may retain any rights to self-help remedies, such as repossession. The exercise of any self-help remedies is not a "Claim" subject to arbitration, nor is any individual action in court by one party that is limited to preventing the other party from using a self-help remedy and that does not involve a request for damages or monetary relief of any kind. Neither you nor I waive the right to arbitrate by using self-help remedies. This Arbitration Clause shall survive any termination, payoff or transfer of this Lease, and shall also survive any bankruptcy to the extent consistent with applicable bankruptcy law. If any part of this Arbitration Clause, other than the Class Action Waiver, is deemed or found to be unenforceable for any reason, the remainder shall remain enforceable.

Notwithstanding any other provision for notice contained in the Lease, any arbitration Claim or other notice provided under the rules of the arbitration administrator will be given to you at the following address: If my Claim is against the Lessor, I agree that notice of my Claim will be given to the Lessor at the address specified in Section 1 of this Lease. If my Claim is against the Assignee (designated in Section 2 of this Lease), I agree that notice of my Claim will be given at 5550 Britton Parkway, Hilliard, OH 43026. If my Claim is against both Lessor and Assignee, I agree that both Lessor and Assignee will be notified of my Claim at the addresses indicated herein.



## 39. LESSEE NOTICES AND SIGNATURES

In this Section 39, I am referred to as "You".

**You have the right to return the Vehicle, and receive a refund of any payments made, if the credit application is not approved, unless nonapproval results from an incomplete application or from incorrect information provided by you.**

**THERE IS NO COOLING OFF PERIOD. California law does not provide for a "cooling off" or other cancellation period for vehicle leases. Therefore, you cannot later cancel this Lease simply because you change your mind, decided the Vehicle costs too much, or wish you had acquired a different vehicle. You may cancel this Lease only with the agreement of the Lessor or for legal cause, such as fraud.**

> **NOTICE TO LESSEE: (1) Do not sign this Lease before you read it or if it contains any blank spaces to be filled in; (2) You are entitled to a completely filled in copy of this Lease; (3) Warning – Unless a charge is included in this Lease for public liability or property damage insurance, payment for that coverage is not provided by this Lease.**

**By signing below, you acknowledge that you have read all pages of this Lease, and that you have received a completely filled in copy of this Lease.**

X _____
Lessee

By (Print Name & Title if Corporation)

x **N/A** _____
Lessee

**N/A**

By (Print Name & Title if Corporation)

## 40. GUARANTY

I jointly and severally guarantee payment and performance of all promises contained in this Lease. Upon default, Lessor may proceed immediately against me without first proceeding against the Lessee. My liability will be unconditional and will not be affected by any settlement, extension, renewal or modification of this Lease whether or not by operation of law. I waive all right to notices of every kind, including rights to demand and presentment. I agree to pay all expenses (including reasonable attorney's fees and legal expenses) incurred by Lessor if Lessor has to enforce this Guaranty.

> **NOTICE TO LESSEE: (1) Do not sign this Lease before you read it or if it contains any blank spaces to be filled in; (2) You are entitled to a completely filled in copy of this Lease; (3) Warning – Unless a charge is included in this Lease for public liability or property damage insurance, payment for that coverage is not provided by this Lease.**

**By signing below, you acknowledge that you have read all the pages of this Lease, that you have received a completely filled in copy of this Lease.**

Guarantor's Signature: X **N/A** _____

**N/A**
Name
**N/A**
Address

Guarantor's Signature: X **N/A** _____

**N/A**
Name
**N/A**
Address

## 41. LESSOR'S ACCEPTANCE AND ASSIGNMENT

By signing below, Lessor (1) accepts the terms, conditions and obligations of this Lease and (2) assigns all right, title and interest in the Vehicle and this Lease to the Assignee listed in Section 2 above. This Lease, including all amounts to become due under it, and any guaranty, are subject to the provisions of the Center Agreement between Lessor and BMW FS.

Lessor Name **CREVIER BMW** _____

Signature of Authorized Representative _____



2204L (7/13) (CA)

**EXHIBIT B**

PLAINTIFF'S COMPLAINT FOR DAMAGES



**FARMERS**
INSURANCE

Send all correspondence to:
Email: myclaim@farmersinsurance.com
Please include your claim# on any correspondence
Farmers Insurance Total Loss COE
P.O. Box 108815
Oklahoma City, OK 73101-8815
Fax: (877) 217-1389

February 15, 2022

Nagabet Boyadjian
███████████████
███████████

RE:   Claim Number:         ███████████
       Loss Date:          02-01-2022
       VIN:              5UXCR4C06L9B32154
       Vehicle:         2020 BMW X5 4D 2WD SDRIVE 40I

Dear Nagabet Boyadjian:

Your vehicle has been determined to be a total loss. The value of the vehicle was based on the vehicle's actual cash value at the time of the loss. We evaluated your vehicle using CCC. The vehicle's mileage, equipment, and condition are taken into account when determining the actual cash value. The settlement amount was determined as follows:

| Actual Cash Value: | | $59,506.00 |
|---|---|---|
| Sales Tax: | + | $6,099.37 |
| License / Transfer Fees: | + | $136.33 |
| Other: | + | $225.00 |
| Less Deductible: | - | $1,500.00 |
| **Total Amount:** | | $64,466.70 |

Please use the enclosed pre paid shipping label to return your title and lien release (if applicable) for the above referenced vehicle. You can call 1-800-GO FEDEX to have it picked up at no cost to you.

If within 35 days of receiving this settlement you cannot find a comparable vehicle for the gross settlement amount, you may notify us and we will re-open the claim for further evaluation.

If your policy is still in force, there are several good reasons to continue your policy coverage.

For example, even if you have not purchased another automobile, you may be insured while driving a borrowed or non-owned vehicle.

**Please note:**  This vehicle will not be automatically removed from your policy. You will continue to be billed a premium until the vehicle has been removed. You must contact your agent, Vartan Safarian at 818-308-9343 to request the vehicle be removed and the coverage deleted.

Per California law, whenever the owner of a vehicle sells or transfers his or her title and delivers the possession of the vehicle to another, the owner shall within five calendar days, notify the DMV of the sale or transfer. This notification can be submitted electronically at following address:

https://www.dmv.ca.gov/portal/vehicle-registration/titles/title-transfers-and-changes/notice-of-transfer-and-release-of-liability-nrl/

Please note that instead of notifying the state electronically, you may physically mail in the detachable part of your title with the completed information. When notifying the California DMV of your release of interest, you will need the following information below:

| | |
|---|---|
| New Owner's Name: | Farmers Insurance Exchange |
| Address: | PO Box 268994 Oklahoma City, OK 73126 |
| License Plate: | 8RED307 |
| VIN: | 5UXCR4C06L9B32154 |
| Odometer: | 15178 |

I am committed to earning your satisfaction with the claims process. If you have any questions or concerns regarding your total loss, please feel free to contact me at 913-827-5169.

Sincerely,
Alan Jackson
Claims Representative
Farmers Insurance Exchange

Enclosure(s): XLP - INST - DOCUSIGN, XLP - APPLICATION FOR REFUND - REG 65 - CA - DS, XLP - VTF - REG 262 - CA - DS, XLP - STATEMENT OF FACT - REG 256 - CA - DS, TLP - TRUE CAR FLYER   Return Shipping Label



# INSTRUCTIONS FOR ELECTRONIC DOCUMENT SIGNING

In order to facilitate the conclusion of your claim:

- If you have the title and it is registered in your name, please make sure to sign it as it is listed on the title and send it back to us.
- If your title shows a lien holder, include a lien release with your title.
- Please return your title, any documents requested above and any additional keys using the prepaid shipping label provided in this email. Please call FedEx at 1-800- GO FED EX (1-800-463-3339) to schedule a time for them to pickup your return package. Do not send the package through the US Post Office unless you are directed to do so by FedEx.


- Please complete all required DocuSign fields and then click the Finish button in the upper right-hand corner.
- Once all document(s) are electronically signed, they will be returned to your Claims Representative.
- If you need assistance completing the forms please call Alan Jackson at 913-827-5169.

Thank You

**EXHIBIT C**

PLAINTIFF'S COMPLAINT FOR DAMAGES

| Month | Adj Cap Cost | Rate | Monthly Rate | | Total | Balance | Mo'ly Pmt | Total Base Pmts | Initial Adj CapCost | Adj Lease Balance |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | $62,994.98 | 1.83163 | 0.001526358 | $96.15 | $96.15 | $63,091.13 | $798.77 | $798.77 | $62,994.98 | $62,292.36 |
| 2 | $62,292.36 | 1.83163 | 0.001526358 | $95.08 | $191.23 | $62,387.44 | $798.77 | $1,597.54 | $62,994.98 | $61,588.67 |
| 3 | $61,588.67 | 1.83163 | 0.001526358 | $94.01 | $285.24 | $61,682.68 | $798.77 | $2,396.31 | $62,994.98 | $60,883.91 |
| 4 | $60,883.91 | 1.83163 | 0.001526358 | $92.93 | $378.17 | $60,976.84 | $798.77 | $3,195.08 | $62,994.98 | $60,178.07 |
| 5 | $60,178.07 | 1.83163 | 0.001526358 | $91.85 | $470.02 | $60,269.92 | $798.77 | $3,993.85 | $62,994.98 | $59,471.15 |
| 6 | $59,471.15 | 1.83163 | 0.001526358 | $90.77 | $560.80 | $59,561.93 | $798.77 | $4,792.62 | $62,994.98 | $58,763.16 |
| 7 | $58,763.16 | 1.83163 | 0.001526358 | $89.69 | $650.49 | $58,852.85 | $798.77 | $5,591.39 | $62,994.98 | $58,054.08 |
| 8 | $58,054.08 | 1.83163 | 0.001526358 | $88.61 | $739.10 | $58,142.69 | $798.77 | $6,390.16 | $62,994.98 | $57,343.92 |
| 9 | $57,343.92 | 1.83163 | 0.001526358 | $87.53 | $826.63 | $57,431.45 | $798.77 | $7,188.93 | $62,994.98 | $56,632.68 |
| 10 | $56,632.68 | 1.83163 | 0.001526358 | $86.44 | $913.07 | $56,719.12 | $798.77 | $7,987.70 | $62,994.98 | $55,920.35 |
| 11 | $55,920.35 | 1.83163 | 0.001526358 | $85.35 | $998.43 | $56,005.71 | $798.77 | $8,786.47 | $62,994.98 | $55,206.94 |
| 12 | $55,206.94 | 1.83163 | 0.001526358 | $84.27 | $1,082.69 | $55,291.20 | $798.77 | $9,585.24 | $62,994.98 | $54,492.43 |
| 13 | $54,492.43 | 1.83163 | 0.001526358 | $83.17 | $1,165.87 | $54,575.61 | $798.77 | $10,384.01 | $62,994.98 | $53,776.84 |
| 14 | $53,776.84 | 1.83163 | 0.001526358 | $82.08 | $1,247.95 | $53,858.92 | $798.77 | $11,182.78 | $62,994.98 | $53,060.15 |
| 15 | $53,060.15 | 1.83163 | 0.001526358 | $80.99 | $1,328.94 | $53,141.14 | $798.77 | $11,981.55 | $62,994.98 | $52,342.37 |
| 16 | $52,342.37 | 1.83163 | 0.001526358 | $79.89 | $1,408.83 | $52,422.26 | $798.77 | $12,780.32 | $62,994.98 | $51,623.49 |
| 17 | $51,623.49 | 1.83163 | 0.001526358 | $78.80 | $1,487.63 | $51,702.29 | $798.77 | $13,579.09 | $62,994.98 | $50,903.52 |
| 18 | $50,903.52 | 1.83163 | 0.001526358 | $77.70 | $1,565.32 | $50,981.21 | $798.77 | $14,377.86 | $62,994.98 | $50,182.44 |
| 19 | $50,182.44 | 1.83163 | 0.001526358 | $76.60 | $1,641.92 | $50,259.04 | $798.77 | $15,176.63 | $62,994.98 | $49,460.27 |
| 20 | $49,460.27 | 1.83163 | 0.001526358 | $75.49 | $1,717.42 | $49,535.77 | $798.77 | $15,975.40 | $62,994.98 | $48,737.00 |
| 21 | $48,737.00 | 1.83163 | 0.001526358 | $74.39 | $1,791.81 | $48,811.39 | $798.77 | $16,774.17 | $62,994.98 | $48,012.62 |
| **22** | **$48,012.62** | **1.83163** | **0.001526358** | **$73.28** | **$1,865.09** | **$48,085.90** | **$798.77** | **$17,572.94** | **$62,994.98** | **$47,287.13** |
| 23 | $47,287.13 | 1.83163 | 0.001526358 | $72.18 | $1,937.27 | $47,359.31 | $798.77 | $18,371.71 | $62,994.98 | $46,560.54 |
| 24 | $46,560.54 | 1.83163 | 0.001526358 | $71.07 | $2,008.34 | $46,631.61 | $798.77 | $19,170.48 | $62,994.98 | $45,832.84 |
| 25 | $45,832.84 | 1.83163 | 0.001526358 | $69.96 | $2,078.29 | $45,902.79 | $798.77 | $19,969.25 | $62,994.98 | $45,104.02 |
| 26 | $45,104.02 | 1.83163 | 0.001526358 | $68.84 | $2,147.14 | $45,172.87 | $798.77 | $20,768.02 | $62,994.98 | $44,374.10 |
| 27 | $44,374.10 | 1.83163 | 0.001526358 | $67.73 | $2,214.87 | $44,441.83 | $798.77 | $21,566.79 | $62,994.98 | $43,643.06 |
| 28 | $43,643.06 | 1.83163 | 0.001526358 | $66.61 | $2,281.48 | $43,709.67 | $798.77 | $22,365.56 | $62,994.98 | $42,910.90 |
| 29 | $42,910.90 | 1.83163 | 0.001526358 | $65.50 | $2,346.98 | $42,976.40 | $798.77 | $23,164.33 | $62,994.98 | $42,177.63 |
| 30 | $42,177.63 | 1.83163 | 0.001526358 | $64.38 | $2,411.36 | $42,242.01 | $798.77 | $23,963.10 | $62,994.98 | $41,443.24 |
| 31 | $41,443.24 | 1.83163 | 0.001526358 | $63.26 | $2,474.62 | $41,506.50 | $798.77 | $24,761.87 | $62,994.98 | $40,707.73 |
| 32 | $40,707.73 | 1.83163 | 0.001526358 | $62.13 | $2,536.75 | $40,769.86 | $798.77 | $25,560.64 | $62,994.98 | $39,971.09 |
| 33 | $39,971.09 | 1.83163 | 0.001526358 | $61.01 | $2,597.76 | $40,032.10 | $798.77 | $26,359.41 | $62,994.98 | $39,233.33 |
| 34 | $39,233.33 | 1.83163 | 0.001526358 | $59.88 | $2,657.64 | $39,293.21 | $798.77 | $27,158.18 | $62,994.98 | $38,494.44 |
| 35 | $38,494.44 | 1.83163 | 0.001526358 | $58.76 | $2,716.40 | $38,553.20 | | | | |

1  Hovanes Margarian, SBN 246359
   hovanesm@margarianlaw.com
2  Armen Margarian, SBN 313775
   armenm@margarianlaw.com
3  Shushanik Margarian, SBN 318617
   shushanik@margarianlaw.com
4  THE MARGARIAN LAW FIRM
   462 West Colorado Street
5  Glendale, California 91204
   Telephone Number: (818) 553-1000
6  Facsimile Number: (818) 553-1005

7  Attorneys for Plaintiff
   HAGOB BOYADJIAN

8

9              SUPERIOR COURT OF THE STATE OF CALIFORNIA

10                    THE COUNTY OF ORANGE

11

12  HAGOB BOYADJIAN, an individual,        Case No.:

13          Plaintiff,              **PLAINTIFF'S STATEMENT OF DAMAGES**

14  vs.

15  BMW FINANCIAL SERVICES NA, LLC, a
    Delaware Limited Liability Company; PAG
16  SANTA ANA B1, INC., a Delaware Corporation;
    and DOES 1 through 30, inclusive,
17
            Defendants.
18

19  ///

20  ///

21  ///

22  ///

23  ///

24  ///

25  ///

26  ///

27  ///

28  ///

                    PLAINTIFF'S STATEMENT OF DAMAGES

1        NOW COMES Plaintiff HAGOB BOYADJIAN, an individual ("Plaintiff"), by and through

2    Plaintiff's attorneys of record The Margarian Law Firm, with Plaintiff's Statement of Damages against

3    Defendants BMW FINANCIAL SERVICES NA, LLC, a Delaware Limited Liability Company; PAG

4    SANTA ANA B1, INC. a Delaware Corporation ("Defendant"); and DOES 1 through 30, inclusive,

5    allege and affirmatively state as follows:

## DAMAGES

7    1.  Actual Damages:

8          a.  Equity equal to $16,829.57.

9    2.  Punitive Damages:

10          a.  Nine times the actual damages, hence $151,466.13.

11    3.  Attorneys' fees:

12          a.  At an hourly rate of $750.00.

13    4.  Costs:

| | |
|---|---|
| Filing Fees | $435.00 |
| e-Filing Fees | $25.83 |
| Service of Process Fees | $160.00 |
| Sub-Total | $620.83 |

18    Grand total of $168,916.53 plus attorneys' fees to date at time of settlement or judgment. The

19    proposed form of judgment is an immediate cash payment of the aforementioned sums. This Statement

20    of Damages is subject to amendment.

21    DATED: 11/29/2023               THE MARGARIAN LAW FIRM
462 West Colorado Street
Glendale, California 91204

By */s/ Hovanes Margarian*
Hovanes Margarian
Attorney for Plaintiff
HAGOB BOYADJIAN